## ST. JOSEPH STOCK YARDS CO. v. UNITED STATES et al.

### No. 245.

District Court, W. D. Missouri, St. Joseph Division.

May 1, 1935.

324

Harold M. Stephens, Asst. Atty. Gen., Wendell Berge, Sp. Asst. Atty. Gen., Seth Thomas, Asst. Atty. Gen., and J. S. Bohannan, Atty., Department of Agriculture, of Washington, D. C., and Maurice M. Milligan, U. S. Dist. Atty., of Kansas City, Mo., for defendants.

Before STONE, Circuit Judge, and REEVES and OTIS, District Judges.

PER CURIAM.

In 1929 the Acting Secretary of Agriculture initiated an inquiry into the rates being charged by petitioner for various services at its stockyards at St. Joseph, Mo. After full hearing, the matter was finally argued and submitted in May, 1930. In February, 1931, and before decision, petitioner filed an application to reopen the case because of changes in general economic conditions affecting its business. The Secretary denied this application, and (July, 1931) entered an order fixing rates. An action to enjoin these rates resulted in determination by this court that the case should have been reopened. St. Joseph Stock Yards Co. v. United States (D. C.) 58 F.(2d) 290. Thereafter the Acting Secretary reopened the case generally, and hearing was had from January 10 to February 16, 1933. On January 6, 1934, the Acting Secretary forwarded proposed findings, conclusions, and order to petitioner with a statement that exceptions thereto might be filed by February 2, 1934. On February 2d petitioner filed exceptions and also filed an application again to reopen the case because of change in conditions since the close of the hearing on February 16, 1933. In May, 1934, the Secretary denied the application to reopen the case and entered an order fixing rates. This action challenges both the denial of the application to reopen and the order fixing rates.

## I. Application to Reopen.

Obviously, if the case should be reopened for further evidence before the Secretary, no decision here upon the rate order is in place. Therefore the propriety of reopening the case will be considered first.

Culver & Phillip, of St. Joseph, Mo., and William N. Strack and Ross Dean Rynder, both of Chicago, Ill., for petitioner.

The changes relied upon in the application to reopen as being changes of an unusual character affecting the business of this petitioner are set forth therein and are as follows: (1) Effect of

the Agricultural Adjustment Act (May 12, 1933, USCA, title 7, §§ 601–619); (2) effect of National Industrial Recovery Act (June 16, 1933, USCA, title 15, §§ 701–712); (3) effect of action of the President under the Gold Reserve Act (January 30, 1934, USCA, title 31, §§ 440–446); (4) showing of actual business experience for calendar year 1933.

■ 1. The argument as to effect of the Agricultural Adjustment Act is that the announced policy of the Secretary is to reduce the number of hogs which he has power to do under the processing tax powers; that this results in 25 per cent. per annum reduction hereafter and vitally influences the volume of hogs coming to this market. As to cattle and sheep, the contention is that various efforts are being made to include them within the power of similar reduction by the Secretary. Any virtue in this contention must depend upon the relative permanency of the order as to hogs—the matter as to sheep and cattle is entirely speculative. In fact, the permanency of the hog order is purely speculative.

This ground is solely concerned with the volume of business, by that meaning the volume of receipts of live stock at complainant's yards. The Secretary used an estimated volume as a rate factor (page 160). Therein he states the numbers each of cattle, calves, hogs, and sheep used in his factor. A comparison of these figures with those of actual receipts (page 157) for the six years, 1927–1932, inclusive, reveals that the Secretary's figures are very conservative. As to hogs, his figure is only 126,010 above the lowest receipt (in 1932) during the above six-year period. In view of the above conservatism of the Secretary, it is by no means clear that such estimates are so far wrong as to be influenced materially by the operation of this act.

Because of the speculative character as to the occurrence or permanency of the suggested action by the Secretary under the act and because of the conservative estimate of volume of receipts used by the Secretary, we think this ground insufficient to warrant reopening of the case.

■ 2. The contention as to the National Industrial Recovery Act is that it has resulted in a substantial raise in wages of employees. Also it is alleged that existing labor and economic conditions have had a like effect. The permanency and the extent of these effects are, obviously, uncertain and doubtful.

■ 3. The effect of the Gold Reserve Act action, both on increase in operating expenses and in an estimated cost of reproduction new, less depreciation of complainant's structures, seems too speculative to merit consideration.

■ 4. As to the estimated effect of these rates if applied to 1933 business, the difference between the amount which is claimed would have been earned thereunder and the amount found by the Secretary to constitute the reasonable net return is too small to be taken as a guide for a rate. It is to be expected that any business will have annual fluctuations. Rates are not based upon the result of the business of any one year alone but upon what is estimated as being the average business over a proper term of years; the future being gauged by the past. The past years here taken by which to gauge the future include six years, two of which were deeply affected by the depression. The experience before the Secretary was up to ten days before the date of the hearing.

All of the above contentions involve effects upon the business of petitioner which are entirely uncertain and unpredictable with any degree of accuracy. They are being urged in connection with the rates in the order here challenged. Only actual experience under such rates can furnish any real criterion or guide as to the effects urged. This experience should be obtained by practical test. No sufficient showing appears for not making such test to determine these matters which are of such doubtful and uncertain influence. The case should not be reopened at this time. If actual experience hereafter for a proper period under the rates fixed by the order reveals sufficient reasons, the order can then be challenged through the proper channels.

II. Confiscatory Character of Rate Order.

1. Powers of Secretary.

■ Numerous attacks are made upon the power of the Secretary to determine various elements of fact entering into a decision upon the rates. It is unnecessary to discuss separately any of these. The power of Congress to regulate the rates at stockyards through the Packers and Stockyards Act (7 USCA § 181 et

seq.) has been sustained (Stafford v. Wallace, 258 U. S. 495, 42 S. Ct. 397, 66 L. Ed. 735, 23 A. L. R. 229; Tagg Bros. & Moorhead v. United States, 280 U. S. 420, 50 S. Ct. 220, 74 L. Ed. 524). That act empowers the Secretary of Agriculture to determine rates. Obviously, such designation carries all powers necessary or proper to execute the authority. Vital to such execution is the investigation and determination of all fact matters pertinent to rates to be regulated. The contentions here have to do only with such matters.

## 2. Confiscation.

 *Scope of Review.*—At the very threshold is the preliminary question: What is the scope of this review? Is the petitioner entitled to the independent judgment of this court as to the law and the facts upon the record made before the Secretary or is this court bound to accept the findings of fact made by the Secretary if they are supported by substantial evidence? [1]

If violation of the Constitution were not charged, there would be no doubt but that in the review here inquiry as to facts should go no further than to determine whether the facts found are substantially supported. Tagg Bros. & Moorhead v. United States, 280 U. S. 420, 443, 444, 50 S. Ct. 220, 74 L. Ed. 524. But the debate, whether when the issue of confiscation is raised the court' independently should make findings, a debate not yet decided by the Supreme Court as to cases arising under the Packers and Stockyards Act, goes on. The Supreme Court expressly passed the question without decision in the Tagg Bros. Case, 280 U. S. 420, loc. cit. 443, 50 S. Ct. 220, 74 L. Ed. 524.

The question should be decided, and it should be decided in this case. The court ought not to exceed its jurisdiction, and it ought not invade the jurisdiction of an administrative agency. Moreover, it is greatly to be desired that a clear guide should be set up for use in future cases of this character.

The latest decision of this question was by a three-judge court for the District of Nebraska. Union Stock Yards Co. v. United States (D. C.) 9 F. Supp. 864. The case was similar to this. The principal issue was that of confiscation. In the opinion by Circuit Judge Woodrough (Circuit Judge Gardner and District Judge Munger concurring) the court said (9 F. Supp. 864, loc. cit. 873): "Our judicial function does not go beyond the decision of the constitutional question whether the rates as fixed are confiscatory. His [the Secretary's] findings of fact supported by substantial testimony are not subject to review."

That the court is required to exercise its independent judgment as to the facts was the view expressed in the opinion of a three-judge court in Denver Union Stock Yard Co. v. United States (D. C.) 57 F.(2d) 735, 739.

In St. Joseph Stock Yards Co. v. United States (D. C.) 58 F.(2d) 290, loc. cit. 296, the question was not decided, but in a footnote to the opinion it is said that a majority of the court subscribed

---

[1] A third alternative is that, where a constitutional issue is involved, the reviewing court must accord the petitioner a hearing de novo. In this case, however, there was no request for such a hearing and no additional evidence was offered before this court. The Supreme Court said in Tagg Bros. & Moorhead v. United States, 280 U. S. 420, 443, 50 S. Ct. 220, 226, 74 L. Ed. 524, that "a proceeding under section 316 of the Packers and Stockyards Act [7 USCA § 217] is a judicial review, not a trial de novo." Compare, however, the opinion of the Supreme Court in Crowell v. Benson, 285 U. S. 22, 52 S. Ct. 285, 76 L. Ed. 598, in which it was ruled that a hearing de novo rightfully was demanded by the litigant claiming infringement of constitutional rights. But see the dissenting opinion of Brandeis, J., 285 U. S. 22, loc. cit. 65, 52 S. Ct. 285, 76 L. Ed. 598. Crowell v. Benson was not a case arising under the Packers and Stockyards Act.

The scope of judicial review in a case of this character does, of course, involve other matters than a consideration as to whether the findings made by the administrative agency are supported by substantial evidence. These other matters include inquiry: (1) Whether the statutory procedure was followed by the administrative agency; (2) whether the order made is supported by the findings made; (3) whether erroneous rules of law were followed to reach the findings. Tagg Bros. & Moorhead v. United States, 280 U. S. 420, 50 S. Ct. 220, 74 L. Ed. 524; Interstate Commerce Commission v. Illinois Central Railroad Co., 215 U. S. 452, 478, 30 S. Ct. 155, 54 L. Ed. 280; Morgan v. United States (D. C.) 8 F. Supp. 766, 768.

to the first and a minority to the second of the two theories stated.

A three-judge court in Morgan v. United States (D. C.) 8 F. Supp. 766, loc. cit. 769, stated the two theories, but did not find it necessary to choose between them.

No other cases have arisen or been decided under the Packers and Stockyards Act.

True it is that the Supreme Court long since ruled that, where an order of a rate-regulating body, acting under state authority, is challenged as confiscatory, and hence violative of the due process clause of the Fourteenth Amendment, the reviewing federal court must exercise its independent judgment as to facts and law. Ohio Valley Water Co. v. Ben Avon Borough, 253 U. S. 287, 40 S. Ct. 527, 64 L. Ed. 908.[2] Upon first thought it might seem that this decision is determinative of the present question. For the due process clause in the Fifth Amendment is identical in significance with the due process clause in the Fourteenth Amendment. Closer observation, however, reveals an essential distinction between the Ben Avon Borough Case and a case where rates are fixed by an administrative agency of the United States whose findings of fact are made conclusive by statute.

Findings of fact made by the Secretary of Agriculture in a proceeding under the Packers and Stockyards Act are made conclusive by statute. By that act the laws pertaining to orders of the Interstate Commerce Commission are made applicable to orders of the Secretary. Title 7, USCA, § 217. The Interstate Commerce Act (title 49, USCA, § 16 (12), makes the findings of the Interstate Commerce Commission conclusive if supported by substantial evidence. Tagg Bros. & Moorhead v. United States, 280 U. S. 420, 440 (see footnote on p. 444), 50 S. Ct. 220, 226, 74 L. Ed. 524.

If in a judicial review of an order of the Secretary his findings supported by substantial evidence are conclusive upon the reviewing court in every case where a constitutional issue is not involved, why are they not conclusive when a constitutional issue is involved? Is there anything in the Constitution which expressly makes findings of fact by a jury of inexperienced laymen, if supported by substantial evidence, conclusive, that prohibits Congress making findings of fact by a highly trained and especially qualified administrative agency likewise conclusive, provided they are supported by substantial evidence?

The constitutional provision relied on is that (article 3, § 1) which provides that "the judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." The contention is that the phrase "judicial Power" includes the exclusive power finally to decide all issues of fact in a case where a constitutional right is claimed to have been violated. But it is not contended that it includes that exclusive power where a constitutional right is not claimed to have been violated. A case of the latter character may be quite as important to the litigant as a case of the former character and may involve as much. No good reason can be given for this distinction. "In respect to the question * * * of the finality to be accorded administrative findings of fact * * * I see no reason for making special exception as to issues of constitutional right, * * *" said Mr. Justice Brandeis (Mr. Justice Stone and Mr. Justice Roberts concurring) in his dissenting opinion in Crowell v. Benson, 285 U. S. 22, 80, 52 S. Ct. 285, 303, 76 L. Ed. 598.

Upon this phase of the case our view coincides with that expressed by the learned justice of the Supreme Court as thus set out and with that of Circuit

[2] When it is said that an independent judgment must be reached by the court, it is meant that the court's findings must be determined by the weight of the evidence and not by a consideration as to whether the findings of the administrative agency are supported by substantial evidence or are arbitrary. A finding may well be supported by substantial evidence and still be against the weight of the evidence. The advocates of each of the two theories, (1), that the court must give its independent judgment on the record made and that, (2), it must accord a de novo hearing, agree that the findings of the administrative agency should be looked upon as presumptively correct. That is far less, however, than an acceptance of the findings of the administrative agency as conclusive if they are supported by substantial evidence or are not arbitrary.

Judge Woodrough in Union Stock Yards v. United States, supra.

We have not overlooked what was said in Crowell v. Benson, 285 U. S. 22, 60, 52 S. Ct. 285, 296, 76 L. Ed. 598, that: "In cases brought to enforce constitutional rights, the judicial power of the United States necessarily extends to the independent determination of all questions, both of fact and law, necessary to the performance of that supreme function. The case of confiscation is illustrative, the ultimate conclusion almost invariably depending upon the decisions of questions of fact. This court has held the owner to be entitled to 'a fair opportunity for submitting that issue to a judicial tribunal for determination upon its own independent judgment as to both law and facts.' "

But Crowell v. Benson was not a packers and stockyards case. In Crowell v. Benson it was ruled the administrative agency whose action was sought to be enjoined was not one whose findings of fact were made conclusive by statute. On the contrary, it was expressly ruled that the statute conferring powers on the agency in question did not make his findings conclusive even if supported by substantial evidence. The case, therefore, is to be distinguished from a case in which findings are so made conclusive.

Beyond the above challenges to the power of the Secretary, the attacks upon the rates are aimed at the findings of fact pertinent to determination by the Secretary. There is no essential fact which escapes assault. This order shows careful consideration by the Secretary. Even careful consideration may involve error, but it so rarely hives a swarm of errors as to be a fit target for shotgun charges intended to scatter all over it. Nevertheless, heavily burdened courts are compelled to examine every separate matter. The attacks here are upon (A) the rate base value; (B) the rate of return; (C) the experience test period; (D) the operating expenses; and (E) a particular finding as to "feed lot yardage" charge.

## A. Rate Base Value.

The challenges as to the rate base value include (1) the amount of land included; (2) the value of the land included; (3) the exclusion of certain structures; (4) the value of the included structures; (5) the exclusion of "pre-organization expenses" and "cost of financing"; (6) the exclusion of "going concern" value; (7) the amount of "depreciation reserve."

## (1) Amount of Land.

The total ownership of land is 16,182,-641 square feet (372.414 acres). Of this, 7,925,577 square feet (181.946 acres) is concededly not used and useful. Petitioner claims that all of the balance—8,257,-064 square feet (189.556 acres)—is used or useful. Of this balance, the Secretary found 4,410,361 square feet (101.-248 acres) used and useful. The dispute is over the difference of 3,846,703 square feet (88.308 acres). The loss in the rate base value by exclusion of this land is claimed to be $356,263.33. All of the land is considered (conveniently) in the evidence under various zones. The disputed land is found in zones A, B, C, D, F, L, N, 1, 2, and 3.

In presenting this matter, petitioner classifies this disputed land under four headings: (a) The Transit House; (b) expansion land; and (c) "a number of minor errors which are each small but total a substantial amount." While plaintiff separately discusses the "Anchor Serum Company plant," the substantial reason urged for its inclusion is for expansion purposes; therefore it will be included under that heading.

## (a) Transit House.

This tract is a piece of land having 15,805 square feet occupied by a hotel called the Transit House. This is a commercial hotel patronized principally by shippers to the yard and by drivers of trucks carrying live stock to or from the yards. The contention is that this property should be included in the rate base value because it is a necessary convenience connected with the yards business. While the yards are some distance from the hotel section of the city proper, there is no sufficient showing of any reason why other hotels and lodging houses could not be used by those having business with the stockyards. It would have to be shown very clearly that the business of the yards would be materially affected by the absence of a near-by hotel before it could be said that the maintenance of such was so related to the yards business as to make it proper to be included in the rate for yard services. There is no such showing here, and the exclusion thereof by the Secretary is sustained.

329

## (b) Expansion Land.

This land includes several tracts. The argument is that error exists in excluding the Anchor tract (349,449 square feet); 722,160 square feet in zone C; 498,152 square feet in zone D; and 1,921,946 square feet in zone F.

■ The matter of including or excluding land or property held for business expansion in the rate base is the matter of who—the ratepayers or the company —shall carry property which is not being used to produce the service paid for by the rate. Obviously, it may be proper and good business judgment may sometimes dictate provision for future expansion of the business. It is equally clear that, so far as the present ratepayers are concerned, there must be a limit to the extent to which they can be compelled to pay for providing possible future facilities for future business. While a broad power and discretion must be left undisturbed in company management, yet, even as to expenditures directly entering into the present service for which the now customer pays, this discretion is not beyond control. West Ohio Gas Co. v. Public Util. Comm., 294 U. S. 63, 55 S. Ct. 316, 79 L. Ed. 761, decided Jan. 7, 1935; Western Distributing Co. v. Commission, 285 U. S. 119, 124, 126, 52 S. Ct. 283, 76 L. Ed. 655. It would seem that such control should be much more extensive where the expenditure has no part whatsoever in furnishing the service paid for. In fact, the general doctrine is that the rate base is made up of values used in furnishing the service. San Diego L. & T. Co. v. Jasper, 189 U. S. 439, 446, 23 S. Ct. 571, 47 L. Ed. 892. Clearly, courts should somewhat critically examine values which do not enter into furnishing the service paid for, and there should be no presumption in favor of including them in the rate base. The burden is upon the company to show that such inclusion is proper. That showing must be that the properties held for future expansion are in themselves adaptable to such expansion and that there is probable need of them for that purpose in the not too distant future. Property not needed for present requirements may properly be acquired and held for reasons which do not concern the ratepayer; for example, such acquirement is not unusual either for the purpose of future sale to gain the increased increment of value caused by establishment of the industry or for the purpose of protecting the business from competition. See Public Service Commission v. Great Northern Util. Co., 289 U. S. 130, 135, 53 S. Ct. 546, 77 L. Ed. 1080, and Columbus Gas & Fuel Co. v. Commission, 292 U. S. 398, 407, 54 S. Ct. 763, 78 L. Ed. 1327, 91 A. L. R. 1403. Such purposes have nothing to do with business expansion; therefore the company must establish that the land is held really for expansion. Even if held for expansion, there must be showing of a reasonable need for such purposes. This need is a matter of strong probabilities and not mere possibilities or hopes. We examine here such probabilities as shown by the evidence.

Expansion is urged upon two theories, each affecting different tracts. One is for use to sell to packing houses; the other is to care for increased volume or change in method of handling stock at the yards. The first reason applies to tract D, the latter reason to the other tracts.

■ *Tract D.*—For convenience, this tract will be considered first because the expansion reason urged is peculiar to it and for a particular use, while the three other tracts are urged for another reason. The expansion purpose urged for tract D is use as a site for a packing house. The adaptability and location of this tract for such use is evident. The original planning of this stockyards included sites for packing plants alongside the western side of the yards. That space is entirely occupied by three large packing plants (Swift, Morris, and Hammond) except for tract D. The desirability, in fact necessity, of the proximity of packing plants to a stockyard business is clear. They are the main buying strength of such a market. All of these three companies are long established at these stockyards. The evidence reveals but one packing company (a relatively small one) which plaintiff has had in mind to bring to the yards. The evidence shows, also, that this company has established itself elsewhere and is procuring its needs from these yards. There is no showing of any prospect of having this tract occupied by a packing plant. The exclusion of this value by the Secretary is not shown to be erroneous, and his action is approved.

■ *Anchor Serum Company Tract and Tracts in Zones C and F.*—The Anchor

item involves 349,449 square feet in zone B. The reasons urged for including this value for expansion purposes are to provide for growth in volume of business and/or for additional space because of change in method of handling stock. These same reasons are the ones urged for including the two other tracts (zone C and zone F); therefore it will save reiteration to here state the general situation shown concerning expansion for such reasons and any provision therefor in the allowances of the Secretary.

Some of this testimony was taken in 1929 at the first hearing, much more since then at the hearing 1933. At the first hearing it appeared that, since 1915, 12.-22 acres had been used (in zone A) in expansion, but that this had been offset (in zone A) by abandonment of practically an equal area formerly used for southern cattle and for a ten-foot dead-line space adjoining that area (this was caused by a new regulation of the Department concerning shipment of southern cattle); that this abandoned area joined both the cattle and the sheep pens, and would be the space of logical expansion for either. At the second hearing it appeared that none of various plans of expansion put forth at the first hearing had been proceeded with. As to some of these plans, it was alleged they had been suspended for financial reasons, although it appeared that dividends had been paid (though reduced). It also then appeared that since the first hearings the only expansions had been in eight pens and some loading chutes covering a total area of 5,250 square feet (4,000 in the former dead-line space and 1,250 in vacant space near the exchange building). As to present business (last hearing), the testimony was: That on "peak days" the receipts of stock required repeated use of the pens—the main objection to this being some dissatisfaction by customers; that hogs were increasingly coming in by trucks necessitating smaller pens for the smaller loads; that an increase in receipts of stock and in mode of bringing it in (by trucks) would overtax the capacity of the yards. The president and general manager testified he contemplated no immediate expansion and would not venture a prediction as to when such would be necessary.

The Secretary allowed (as feed lots) 890,879 square feet (over 20 acres) in zone A (tract 8 of 103,723 square feet and tract 24 of 383,410 square feet) and zone B (O'Connell feed lots of 403,746 square feet). Tract 8 and the O'Connell lots adjoin the hog pens, while tract 24 adjoins the former southern cattle space and is located for use either in connection with the cattle or the sheep pens.

When we consider that no need for immediate expansion is shown, that no definite plans for expansion exist, that expansion in recent years has been slight, that the abandoned southern cattle tract affords almost as much area for expansion (as to cattle and sheep) as the company has used for expansion for all purposes since 1915, and is the logical area for cattle and sheep expansion, that tract 8 (about 3⅓ acres) adjoins the hog pens and is available for expansion there, it is impossible to conclude that any showing of reasonably near or definite need of any lands in zones B, C, or F exists—much less the clear showing required to overthrow the determination of the Secretary. In this situation, it is unnecessary to examine each of these three tracts separately. It may be added, however, that there could be no shadow of reason for regarding zone F as having any relation to present or near future needs for expansion; and that, as to zone C, an officer of the company testified he was looking to its use twenty to fifty years ahead and that such use would involve removal of the intervening belt line tracks now owned by that railway.

### (c) Minor Tracts.

The "minor errors" claimed are seven items which will be separately treated.

*Illinois avenue Extension in Zone A.*—This is a narrow strip (25,613 square feet) extending west from Packers avenue. It lies entirely between the packing plants of Swift and of Morris. Its only use is as parking space. It is used by any one desiring to use it without restriction. No control of its use is exercised by plaintiff. It is impossible to know who uses it, but it is a fair inference that much of such use is by employees of the packing companies. The open end of the strip is at Packers avenue, which is a roadway running between the packing houses and the yard pens. It is some distance removed from the exchange building. The use or usefulness of this land to the business of the yards is not clear. The usefulness of parking space for trucks

bringing in hogs appears in the evidence and the location of this area (not far from the hog pens) might change the situation if this space were controlled by plaintiff and devoted to such truck parking, but that is not the showing here. It is even more conveniently located to the two packing houses and is subject to use by the employees thereof. It is a narrow space so little adapted to truck parking that plaintiff is now considering an exchange of land which will enable it to widen this area and thus afford better facilities for truck parking. If this should result and the space be devoted to and controlled for such truck parking, a different situation would come into existence which might warrant inclusion of this area. Such is not now true. The exclusion by the Secretary is not shown to be erroneous and is sustained.

*Drainage Ditch in Zone B.*—This ditch drains the south portion of the truck hog dock, a portion of the elevator area and the water tank area (both in southeastern extension of zone A). The use and usefulness of this drain is not disputed. The challenge here is the extent to which the land for it in the southeastern edge of tract B was allowed. Plaintiff claims 53,232 square feet, while the allowance was of only 11,400 square feet; the dispute is over the difference of 41,832 square feet. The issue is the amount of land reasonably needed for this open ditch. The evidence is unsatisfactory as to this matter. A witness for plaintiff in a table ("Respondent's Exhibit 135") of "allocation of uses" of all of the land of the company includes an item of "Drainage Ditch" with a notation of 53,232 square feet in zone B. There is evidence as to the location, course, and uses of this ditch, but not one word further as to the land actually occupied by the ditch and its necessary banks or layout. However, we take this evidence as having the effect that 53,232 square feet was thus occupied. In treating this matter, the Secretary (finding 66) arrives at his figure of 11,400 square feet as follows: The tract is long and narrow and follows the belt railway tracks which it adjoins; it is approximately 950 feet long; "Government Exhibit 107 indicates that a strip of land 12 feet wide is ample to accommodate the ditch in question"; the area 950 feet long by 12 feet wide gives his result of 11,400 square feet. Exhibit

107 is a map of the entire property of plaintiff. We find no notation or other indication whatsoever thereon bearing upon any width of this ditch. We are trying to deal with actual conditions. The selection of 12 feet for width has no relation to reality and no hint of basis in the evidence. It is a purely arbitrary selection which makes the result based thereon just as arbitrary. This finding is unsupported by any evidence and cannot be sustained. The addition allowance is accorded for 41,832 square feet or a total allowance for drainage ditch in zone B of 53,232 square feet.

*Water Tank in Zone B.*—This is a trivial dispute over 529 square feet. Two large water tanks, found by the Secretary to be used in the business, were located in zone A. One of them is at the line of zone B. The contention that some of the supports of this tank extend over the line into zone B and occupy 529 square feet therein seems sustained. The Secretary intended to allow fully for the tanks, and this seems merely a trivial oversight.

*Feed Lots in Zone C.*—Plaintiff contends that the allowance of the Secretary (78,190 square feet) for these feed lots was short 166,402 square feet as it should have been for 244,592 square feet. Christensen (for defendant) and Block (for plaintiff) testified as to this area. The Secretary accepted the figures of Christensen which analyzed this zone with great detail and particularity (Government Exhibit 107-A, tract 12). This conflict was a matter for the Secretary which we do not disturb unless more is shown. Plaintiff contends more is shown in that the evidence of Christensen showed 150,728 square feet of feed lots while the Secretary found only 78,190. Counsel have misapprehended the action of the Secretary in this respect. This action is evidently based upon the evidence of Christensen as shown in Government Exhibit 107-A (tract 12). Item 42 of this exhibit deals with the land in zone C "occupied by buildings and equipment leased to Henry Rockhold." This is divided into eleven items with total square footage of 150,728. Instead of passing on this matter as a whole, the Secretary made separate findings as to four items (e, j, k, and l) and then made a lump finding and allowance (78,190 square feet) as to seven items. The net result of his ac-

tion was to disallow the two items k and 1 (horse and wagon yards 36,693 square feet and old dock 6,800 square feet) and to allow the balance of the 150,728 square feet as three items (Rockhold feed lot 78,190, parking between belt railway and sheep barns 28,901 and meter house 144 square feet). Since this entire matter resolves into a decision upon conflicting evidence, it results that plaintiff has failed to show arbitrary action or clear error, and the finding of the Secretary is sustained.

■ *Drainage Ditch in Zone F.*—This involves disallowance of any land value covering area of a drainage ditch in zone F. This ditch is the extension of the ditch in zone B, above considered. Starting in zone A, this ditch runs southerly along the eastern and southeastern edge of zone B until it crosses under the belt railway tracks where it enters zone F and changes to a westerly course along the northern edge of that zone. It continues this course to about the northwestern corner of zone F, and shortly thereafter empties into Brown's Branch. Besides draining the area in zone A, mentioned above, it later receives the drainage from zone E (the entire area [444,927 square feet] of which was allowed by the Secretary as used and useful). Zone E adjoins zone F along half of the northeastern side of F. The reason stated by the Secretary for disallowing this item is that "it appears" the ditch was "primarily used for draining the remainder of the land in the Zone (F) and only secondarily for carrying water accumulated from respondent's Zone B" (finding 78). The evidence is undisputed that this ditch drains a part of zone A and zones B, E, and F. There is no evidence that it "primarily" drains zone F. The evidence is undisputed that drainage of zones A and E (both found useful) was necessary and that this ditch was the best and most economical method of doing so. The mere fact that it drains other land does not affect its usefulness to the above two zones and is no reason for excluding it; it would have to be used in its entirety to drain zones A and E. The upper reaches of this ditch (in zone B) were allowed by the Secretary. No reason appears in the evidence to differentiate that portion of the ditch in zone F. The only evidence of the land necessary and used for this ditch·

in zone F is 79,680 square feet. This determination of the Secretary is not supported by any evidence and (in that sense) is arbitrary. The allowance is for 79,680 square feet.

■ *Dump and Roadway in Zone L.*—Zone L is bounded on one side by the Missouri river. There is a city public dump on the river bank in this zone. The roadway is across zone L from a city street to the dump. This roadway is leased to the city for public use in connection with the dump and is so used. The entire area of roadway and dump is 42,400 square feet, of which the dump contains 21,900 square feet. While the contention here is broadly for inclusion of both roadway and dump, the footage claimed is 21,900, so it would seem the actual controversy is over the dump. This zone is quite removed from the yards, being some distance back of the packing houses (which face on the yards). The Secretary allowed a dump in zone N. The reason urged for the allowance of this second dump is that it is needed for various kinds of refuse (such as large blocks of concrete, scrap iron and tin, coated asphalt roofing, etc., constituting worn-out materials from the yards construction) which cannot be dumped in the sewer. Necessity for a place to dump such character of material is evident. However, it is evident that occasion for such is infrequent. The use of this tract as a public city dump and the slight use by plaintiff does not constitute a clear showing that the Secretary was wrong in excluding this item, and his action is sustained.

■ *Roadway in Zone N.*—This item is the west half of Exchange street from Lake street South. Exchange street is a public paved street. This portion is bounded by platted lots on the east and by belt railway property on the west. The contention is that this half of the street has never been dedicated to public use. It has been so used for at least 11½ years. The street is used by trucks bringing or taking stock. Obviously, this situation is far from a clear showing of error by the Secretary in disallowing this item, and his action is sustained.

*Summary of "Minor Errors."*—The determinations of the Secretary are sustained as to these items except as to the following allowances: Drainage ditch in zone B; an additional allowance of 41,832

square feet, making a total of 53,232 square feet; water tank in zone B, allowance of 529 square feet; drainage ditch in zone F, allowance of 79,680 square feet.

### Summary as to Amount of Land.

The results of the above discussion as to the amount of land to be included in the rate base value are to sustain the Secretary except as to the three items noted in the just preceding paragraph which items are allowed.

### (2) Value of Land.

 This contention is that the valuation of (16 cents per square foot) of zone A by the Secretary should have been at least 24 cents per square foot. There is no attack upon the land valuations in other zones. The evidence as to land values was from five witnesses—two (Mack and Zelinski) called by the government and three (Spratt, Atkinson and Quinn) called by the petitioner. The higher value contended for by petitioner is apparently based upon its present use as stockyards property and not merely upon the availability of the land for such use, which latter is the proper standard. Clark's Ferry Bridge Co. v. P. S. Commission, 291 U. S. 227, 54 S. Ct. 427, 78 L. Ed. 767; Minnesota Rate Cases [Simpson v. Shepard], 230 U. S. 352, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18. While petitioner's brief (pages 117–139) attacks the reasoning of the Secretary as shown in his report and also attacks the evidence of Zelinski in several respects, we have not been able to conclude that the Secretary was so clearly wrong that we should overthrow his conclusions. His report on this issue (Exhibit A to petition, pp. 67–75) discloses an earnest attempt to consider and analyze all of the testimony of these five witnesses who testified as to land value. This evidence was conflicting, and consisted mainly of expert opinions and statement of and analysis of sales in the vicinity made during various years up to 1929. From this evidence, the Secretary might, in exercising his judgment thereon as to value, have found a different figure—there was no possible exact demonstration of value—but we are not prepared to say that any figure we might reach (if we were the original trier of value) would be any truer than the one found by the Secretary. While petition-

er contends that we should determine this issue de novo, we do not, understand that to be our duty. In fact, we think we have no right or power so to act. The Congress has committed this issue of fact to the Secretary, and our only duty is to keep his action within reasonable bounds; that is, to prevent it being arbitrary. This means that petitioner has the burden of showing that such action is clearly and convincingly wrong. Petitioner has failed to convince us to that effect. We think the value of 16 cents per square foot for zone A should be sustained.

### (3) Exclusion of Structures.

 The Secretary excluded the Terminal Hotel, a harness shop, a garage, and a building used for publication of a stockyards journal as not used and useful property. Petitioner claims these exclusions denied them a value of $231,151 wrongfully. Apparently there was no exclusion of garages (Exhibit A to petition, p. 38). The exclusion of the hotel was proper, and has been adverted to above under (1) (a). The harness shop was properly excluded for the reasons given by the Secretary (Exhibit A, p. 53, par. 83). We are not able to locate the evidence or the finding of the Secretary as to the building used for publication of the stockyards journal except in finding 126, which gives the detailed items of eliminated structures. We conclude all of these exclusions were proper.

### (4) Value of Structures.

 The main contention, as to the value allowed by the Secretary to the various structures included in the rate base, is that too much depreciation was used. The Secretary used 76.04 per cent. as the condition of the structures, while petitioner contends for 89 per cent. condition. We think the reasoning of the Secretary (Exhibit A, pp. 96·103, pars. 137–148) is sustained. Certainly this was a matter of judgment, and it is not clearly shown that the results reached by the Secretary are erroneous.

### (5) Exclusion of "Pre-Organization Expenses" and "Cost Financing."

 It is claimed additions to the overhead for these two items should have been allowed. The reasons of the Secretary (Exhibit A, pp. 92–94, pars. 133–135) are satisfactory. These expenses are purely

accounting possibilities. No actual expenditures for these purposes were shown here. Dayton P. & L. Co. v. Commission, 292 U. S. 290, 309–310, 54 S. Ct. 647, 78 L. Ed. 1267. If shown, we think they should not be allowed. The preliminary expenses allowed by the Secretary (findings 128–132) were certainly all the allowances of that character which should have been made.

### (6) Exclusion of Going Concern Value.

■ The contention is there should have been a separate and distinct allowance for "going concern" value. The Secretary recognized that there was "an element of value in an assembled and established plant doing business and earning money over one not thus advanced" (finding 159), but said:

"Yet, the very impossibility of finding any reasonable rule or measure wherewith to determine, for rate making purposes, the amount of such value, bespeaks the impropriety of attempting to include in rate making valuations any separate allowances for that purpose. The elaboration which Howson gives to his method does not disguise the fact that in the end it is but a guess. An arbitrary percentage of other values leads to the illogical conclusions that the more a property costs the greater is its going-concern value, even though it may not be earning any net return upon its cost of reproduction new. In actuality, going-concern value is conceived to be the difference between the present fair value of the physical properties of a business, plus its working capital, and its actual net earnings capitalized at the going rate of money. The use of such a measure in rate proceedings would have the effect of destroying the result of the elaborate procedure which is undertaken to avoid using capitalized income as a basis for determination of the reasonableness of that income. This is why a separate allowance for the element of going concern has no place in valuation for rate making purposes. Attempts to substitute other methods have led to the confusing and illogical results which so generally characterize separate allowance to cover going-concern value.

"160. Exclusion from the rate base of such separate allowance is not, however, tantamount to the failure to include therein anything for the going concern element.

The very fact that the land used in the business has the value ascribed to it is because of its capacity for use as part of a going concern. The cost of reproduction new of structures is not necessarily value, but only such when and as it relates to property used as a part of a going concern. The record in this case shows that it would cost more to reproduce respondent's structures on a desert, without means of transportation or livestock to market, but that, when so reproduced, they would be valueless. This is because it is the going concern element that transmutes cost of reproduction new into value. When respondent's structures are included in the rate base at the cost of reproduction new less depreciation, rather than scrap or junk value, it is because, and only because, they have inherent in them their use in a going, operating business. Thus, in the rate base herein found, there is included a large amount for going-concern value, but such value is so inextricably interwoven with other values that any attempt to segregate it and set it up alone would lead to a conclusion as arbitrary and illogical as usually is found when such attempts are made."

In Dayton P. & L. Co. v. Commission, 292 U. S. 290, 308, 54 S. Ct. 647, 656, 78 L. Ed. 1267, the court said:

"Objection is made that the going value of the appellant's business should have been included in the base.

"The decisions of this court show what going value means (Los Angeles Gas & Electric Corp. v. Railroad Commission of California, supra, 289 U. S. [287], page 313, 53 S. Ct. 637 [77 L. Ed. 1180]), distinguish it from good will, and hold that upon proof of its existence it may have a place in the base upon which rates are to be computed. The Commission was of opinion that there was here no constituent of property that called for separate appraisal apart from the recognition that had been given it as a contributory factor in other elements of value."

In the same case (292 U. S. 290, page 309, 54 S. Ct. 647, 656, 78 L. Ed. 1267) it was further said:

"The commission took the view that whatever increment of value had emerged from these sources was sufficiently reflected in the allowance of the cost of developing 'new business' and in the ap-

praisal of the physical assets as parts of an assembled whole. A like conclusion has been reached by this court in very similar conditions. Los Angeles Gas & Electric Corp. v. Railroad Commission of California, supra, 289 U. S. [287], page 314, 53 S. Ct. 637 [77 L. Ed. 1180]. Going value is not something to be read into every balance sheet as a perfunctory addition. 'It calls for consideration of the history and circumstances of the particular enterprise.' Los Angeles Gas & Electric Corp. v. Railroad Commission of California, supra, 289 U. S. [287], page 314, 53 S. Ct. 637, 647 [77 L. Ed. 1180]. Here the company was a small one and its organization simple. There was no diversified and complex business with ramifying subdivisions. We cannot in fairness say that, after valuing the assets upon the basis of a plant in successful operation, there was left an element of going value to be added to the total. Even if the addition might have been made without departure from accepted principles, the omission to make it does not appear to have been so unreasonable or arbitrary as to overleap discretion and reach the zone of confiscation. 'It is necessary again, in this relation, to distinguish between the legislative and judicial functions.' Los Angeles Case, supra, 289 U. S. [287], page 314, 53 S. Ct. 637, 647 [77 L. Ed. 1180]. Much that the framers of a schedule are at liberty to do, this court in the exercise of its supervisory jurisdiction may not require them to do. For the legislative process, at least equally with the judicial, there is an indeterminate penumbra within which choice is uncontrolled."

The only evidence as to this element of value was by witness Howson (for petitioner). The testimony of this witness as to the theory and methods he employed is set forth in the testimony at the first hearing beginning with page 283, and is further commented on in his testimony at the second hearing beginning on page 1019. His definition of "going concern" value and the matters upon which he deemed it to depend begins on page 286 of first hearing. His methods are quite complicated and involve numerous assumptions as bases and various computations also resting largely on assumptions or upon information which is not made part of this record except by pure hear-

say. In the end, this entire evidence of Howson is nothing more than an expert opinion resting upon rather shadowy bases of facts. The Secretary was not compelled to accept such evidence as final. Dayton P. & L. Co. v. Commission, 292 U. S. 290, 299, 54 S. Ct. 647, 78 L. Ed. 1267. Moreover, at least some of the elements considered by Howson seem to have been included in the valuation by the Secretary (see finding 136, which includes such items as interest during construction [$125,106] and taxes during construction [$18,257]; possibly, also, insurance during construction [$10,618, $46, and $485]). Even if there were grave doubt as to whether the Secretary had sufficiently included "going concern" value, he cannot be held clearly wrong in not accepting the above evidence as a basis for allowing such value, and there was no other evidence upon which he could have acted. We think, under the situation here, the action of the Secretary in this respect must be sustained.

### (7) Depreciation Reserve.

 The findings of the Secretary (Nos. 173-177) lump repairs and depreciation reserve into one sum ($80,000). The answer herein admits that of this sum $41,500 was for depreciation reserve. Petitioner claims at least $100,000 for such reserve. The evidence is quite intricate and detailed. The evidence is also, of course, in hopeless conflict. That of Government witness Bachman shows great care to discover the elusive fact of what and where there was depreciation not taken care of by repairs, and he pursued his investigation to great detail. Also he thoroughly examined and analyzed the showing of the books of the company as to these items. We think the analysis of his and other testimony on this point in the government's brief is very convincing. The findings of the Secretary show earnest study and consideration of the evidence and a very apparent attitude of fairness. We think the Secretary is fully sustained as to this matter. We are certain there is no clear showing he was not right.

### Rate Base Summary.

The only change we make in the rate base found by the Secretary is the addition thereto of the value of the land which we have above set forth as im-

properly excluded by the Secretary. This land consists of 42,361 square feet (41,-832 and 529) in zone B and 79,680 square feet in zone F. The value, per square foot found by the Secretary for zone B was 16 cents. No value was determined by the Secretary for zone F, since he entirely excluded that zone. Petitioner states in its brief (pages 103, 104) that "the average value of the three appraisers for Zone F was 4¢ per sq. ft.," and apparently adopts that figure. The 42,361 square feet in zone B would (at 16 cents) be a value of $6,777.76. We are very doubtful of our power to find that the value in zone F is 4 cents or any other figure, as that is primarily a duty of the Secretary. However, it may be that, if the inclusion of this additional land in zone F at 4 cents (which seems the value urged by petitioner) will not render the order invalid, we might as well so state and avoid a remand to the Secretary. It is difficult to see how petitioner can complain if we adopt its figure. If this is to be done, the additional 79,680 square feet in zone F will have a value of $3,-187.20.

The rate base fair value was found by the Secretary to be $2,743,000 (finding 161). Adding $6,777.76 for the above land in zone B, this value is $2,749,777.76, and further adding $3,187.20 for the above land in zone F the value is $2,752,964.96 (for convenience in round figures this might be stated as $2,753,000).

### (B) Rate of Return.

■ The Secretary determined a reasonable rate of return to be 7 per cent. (finding 170), which would yield net earnings of $192,010 on his rate base value of $2,-743,000. If the above rate base value of $2,753,000 is adopted, the net yield at 7 per cent. would be $192,710. He then fixed the rate of charge for various services (some being unchanged, some lower and some higher) at figures which he estimated would produce a net income of $195,564 (finding 208). Petitioner contends that, considering the circumstances, locality, and risk of its business, it should have a rate of return of 15 per cent. or 16 per cent. It stresses, also, that the Secretary has allowed 7½ per cent. to two of its competitors at Denver and Omaha, respectively, and upon the first hearing (in 1929) allowed it 7½ per cent.

As usual, there is much conflict in the testimony—mostly expert opinion—as to this issue. The Secretary seems to have given careful consideration to the matter, and we find nothing in the evidence which convinces he was so far wrong, if at all, that his determination should be overthrown.

### (C) Test Period.

■ The Secretary used an estimated future volume of business to test the net return which would probably be received. This he used to ascertain if the particular rate schedule covered by the order would yield a net return equal to 7 per cent. In this estimate he states the numbers of different kinds of stock going to make up this volume. This estimate seems based upon actual receipts for the years 1928–1932. A comparison of the figures in the estimate (finding 201) with those of actual receipts for the above years (finding 195) convinces, that his estimate is conservative if the actual receipts are at all any fair basis from which to reason. Petitioner attacks this period of experience as no proper criterion of the future volume. It is true that conditions were abnormal in 1933 and yet are so, but there is no way of prophesying the future except by the past. There may well be a reduced volume of receipts below the normal for the period chosen. However, what, if any, reduction will occur is a matter purely of opinion, and we can see no reason for thinking our opinion or that of petitioner would be more accurate than that of the Secretary. Certainly this is not convincingly shown.

### (D) Operating Expenses.

■ Petitioner states this contention (brief, p. 342) as follows:

"The right of the Secretary to revise and disallow petitioner's miscellaneous expenses, in the manner shown in paragraph 181 of the decision, is challenged in section IX (I) of the petition. The subject matter is covered in paragraphs 181–193a, pages 120–125, inclusive, of exhibit A to the petition. We shall discuss these exceptions more or less as a group.

"Apparently based upon the allocation of expenses contained in paragraph 181, the decision, (par. 193b) allows $302,500 as reasonable miscellaneous operating expenses. In order to arrive at such a low

figure, it was necessary to deduct the following amounts from the expenses of petitioner for each of the following years:

| | |
|---|---|
| 1927 | $311,709.15 |
| 1928 | 317,365.31 |
| 1929 | 312,812.35 |
| 1930 | 257,969.78 |
| 1931 | 266,853.22 |
| 1932 | 241,673.98 |
| 6 year average | 284,730.63 |

"To compensate for that deduction, the decision allows $123,767 for taxes, repairs and depreciation. This leaves an average annual reduction of petitioner's expenses of $160,963. The only proper items of petitioner's expense which should be deducted in considering its operating expenses are bond interest and discount, which, for the six years, averaged $48,760.07. Deducting this from the $160,963, leaves $112,203, which is the average amount by which the decision reduces petitioner's expenses in order to reduce its rates."

The amount found by the Secretary for operating expenses (excluding taxes and provision for depreciation and repairs —as to which there were separate allowances) was $302,500 (finding 193a). This figure is an average of the book showing of expense expenditures for each of the years 1927–1932, less certain eliminations which the Secretary deemed proper. The book figures are not in question, but the propriety of disallowing the eliminated items is the problem.

The Secretary gives his reasons for each character of elimination (findings 182–193). A detailed list of book shown expenditures is shown in a table attached to finding 181. Checking this table with the findings (182–193), it is ascertained that the substantial "eliminations" consist of depreciation, taxes, and repairs which are not really eliminated from total expense—these three items are eliminated from the $302,500, but they appear as separately allowed items (finding 193b). Two eliminations (bond interest and bond discount) are conceded by the petitioner. This leaves eight items (miscellaneous administration expense, donations and subscriptions, insurance, fiscal agents registrars, etc., miscellaneous O. R. E. expense, casualty insurance O. R. E., costs of shoes sold (employees) bond issue expenses, and interest). In some instances, the Secretary eliminated the entire item; in others, he eliminated a portion of the amount. Some of these items do not appear for all of the above years. Eliminating the year 1930, when there was a "bond issue expense" elimination of $8,277.15 (the only other "bond issue expense" being $1,000 in 1931), the total of all of these items for any one year is less than $6,000. The reason given by the Secretary for each of these eliminations is satisfactory and supported by the evidence.

### (E) Feed Lot Yardage Charge.

The revenues received by petitioner are derived from a variety of different services rendered by it. Among these services are yardage, furnishing of feed and bedding, loading and unloading, furnishing feed lots, and various lesser miscellaneous services (such as dipping and spraying, immunizing hogs, and cattle disease testing). Separate and distinct charges (somewhat based on the worth of the particular service) are made for each of these services. The result is a schedule of rates covering these various charges. The matter considered by and acted upon by the Secretary was this schedule. Of course, the aggregate receipts from all of these charges constitute the gross income of petitioner from which a reasonable net income must be and was estimated by the Secretary. Naturally, the gross and net income involved the receipts from each service as an element entering into such income. Any change in existing rates of the schedule involves changes in all or in some of the separate rates.

The Secretary determined two matters which guided his action in fixing changes in charges in the existing rate schedule (finding 206): First, he found that the existing rates resulted in production of an excessive revenue; second, he found that: "under the existing schedule shippers of livestock who consign their animals to commission men are charged more by the respondent for the use of its facilities in handling such livestock for a shorter period of time than are those who use that portion of its facilities hereinbefore referred to as feed lots for a much longer period of time."

His endeavor was both to reduce the charges to the production of a reasonable revenue and also to remove the above discrimination regarding "feed lot" services. His action resulted in lowering the charge

338

for some services and of raising the charge for feed lot service; regarding the latter, the report states (finding 208) that the new schedule "assesses also on those to whom feed lot service is furnished a charge sufficient to cover repairs and depreciation and pay a fair return on the value of that portion of the property used exclusively by them, and does not levy these expenses mainly on other users of the facilities,' as does the schedule now in effect."

The schedule so formed by him is set out in finding 207. The changes in these feed lot charges are as follows:

```
Sheep Feeding........... 5¢ per head to 38¢ per head
Hog Feed................. 5¢ per head to 38¢ per head
Cattle Feed:
 Where land only is
 furnished ..........15¢ per head to 60¢ per head
 Where sheds and
 other enclosures
 are furnished......35¢ per head to 60¢ per head
```

While the feed lot charges are spoken of as being "raised," it is not meant that it would be a violation of the order if petitioner charged less, but it is an official declaration of the maximum permissible charge. Petitioner contends that this change in feed lot charges results in confiscation "because the evidence shows that the amounts recommended by the Secretary cannot be collected; because, in case the Secretary finds unjust discrimination, he must afford petitioner an alternative method of removal; and because the record is without evidence to support the recommended increased charges."

Petitioner's brief argues the above reasons quite ably, but it seems to us that this argument is completely met by that in the brief of the Secretary (pages 160–175). The evidence supports the position so stated by the Secretary.

### Summary.

We have found no error in the action of the Secretary except as to his exclusion from the rate base of certain land in zones B and F. However, the inclusion of the value of this land, which we think was improperly excluded, is not of sufficient influence to materially affect the result (as to confiscation vel non) here involved. The effect of the inclusion of such land value is as follows:

Secretary's rate base value $2,743,000, plus such added land value ($9,964.96), gives rate base value of $2,752,964.96—for round figures, say $2,753,000. Net return

at rate of 7 per cent. on such rate base is $192,710, which is only $700 more than the amount ($192,010) found necessary under the rate base of the Secretary. Under the estimate of the Secretary (finding 208), the gross revenue is $621,831 and the expenses $426,267, leaving a net revenue of $195,564, which is slightly more than the above net return ($192,-710) necessitated by inclusion of this land value.

Since the above memorandum contains specific findings, in detail, as to all matters of disputed facts, and since a formal finding of facts could be only a restatement of fact conclusions set forth herein, the determination of facts herein is to be taken as the findings of facts; the result being that this court adopts the findings of facts made by the Secretary with the exception of his findings as to the exclusion of certain land in zones B and F, as to which we find that there should be added to the land in zone B an addition of 41,832 square feet and of 529 square feet at a valuation of 16 cents per square foot, and in zone F an addition of 79,680 square feet which we have considered (for the purposes of this case) to be valued at 4½ cents per square foot.

We think the temporary injunction should be vacated and the petition should be dismissed for want of equity.