ATLANTIC COAST LINE RAILROAD COMPANY, a corporation, et al., v. THE RAILROAD COMMISSION OF THE STATE OF FLORIDA, and FLAMINGO TRUCK LINES, INC., a corporation.

5 So. (2nd) 708                                         En Banc
January 9, 1942              Rehearing Denied February 5, 1942

Reuben Ragland, for Petitioner Atlantic Coast Line Railroad Company, John M. Allison, for Petitioner Central Truck Lines, Inc., Oven & Oven for Petitioner Seaboard Air Line Railway Co.

Theo. T. Turnbull, for Respondent Railroad Commission of the State of Florida, and Adair, Kent, Ashby & McNatt, for Respondent Flamingo Truck Lines, Inc.

BUFORD, J.:

On petition for certiorari we are asked to review order of the Railroad Commission known as Order No. 1478, docket No. 737. The order of the Railroad Commission is as follows:

"2. Flamingo Truck Lines, Inc., as result of a certain merger agreement filed with the Secretary of State of the State of Florida under the laws of the State of Florida, and approved by this Commission by Order No. 1312, dated June 20, 1940, is the holder and owner of a consolidated Certificate of Public Convenience and Necessity embracing all of the rights and franchises of Certificates of Public Convenience

and Necessity Nos. 14, 24, 112, 13, 91, 70, 35 and 37. It filed its present application for a Certificate of Public Convenience and Necessity as a common carrier, of freight by motor vehicle on December 26, 1940. Previous applications were filed by L. & L. Freight Lines, Inc., one of its predecessors, on October 21, 1939, and subsequently withdrawn; refiled on December 27, 1939, and withdrawn, and again refiled on October 30, 1940, and withdrawn on or about December 18, 1940. By the present application Flamingo Truck Lines, Inc., desires to operate in intrastate commerce between the Georgia-Florida State Line and Tampa, Florida, and between Jacksonville, Florida, and Marianna, Florida. Schedules over the route between Baldwin and Live Oak to be operated with closed doors.

"3. On February 7, 1936, L. & L. Freight Lines, Inc., one of the predecessors of the present applicant, filed its application with the Interstate Commerce Commission (No. MC-19190) seeking a Certificate of Public Convenience and Necessity to operate in interstate commerce within the State of Florida between Georgia-Florida State line to Tallahassee; thence to Tampa and from Tallahassee to Live Oak and from Tallahassee to Marianna. It was found by the Interstate Commerce Commission that the L. & L. Freight Lines, Inc., had commenced its operation prior to the effective date of Section 206 of the Federal Motor Carrier Act 1935, and had seasonably filed this application and, therefore, it was permitted to continue its operation in interstate commerce until the further order of that Commission. This application was heard by the Interstate Commerce Commission and on February 7, 1941, a final order was entered authorizing

Flamingo Truck Lines, Inc., the successor of L. & L. Freight Lines, Inc., to operate in interstate commerce between Griffin, Georgia, and Tampa, Florida, using U. S. Highway No. 19 to Thomasville; thence over U. S. Highway No. 319 to Tallahassee, Florida; thence over Florida Highway No. 500 to Capps, Florida; thence over U. S. Highway No. 19 to Williston; thence over Florida Highway No. 500 to Ocala; thence over Florida Highway No. 16 to junction of U. S. Highway No. 41; thence over U. S. No. 41 to Tampa; and also between Tallahassee, Florida, and Live Oak, Florida, over Florida Highway No. 1, U. S. No. 90, and also between Tallahassee, Florida, and Marianna, Florida, using Florida Highway No. 1, U. S. Highway No. 90. Thus it is that the Flamingo Truck Lines, Inc., is now operating in interstate commerce over all of the highways now sought by the present application except between Jacksonville and Live Oak. It is proposed by Flamingo Truck Lines, Inc., that the operation between Baldwin and Live Oak shall be conducted with closed doors.

"4. The applicant produced a number of witnesses in the territory and along the line it proposes to serve who testified in support of its application. Most of these witnesses called attention to the fact that there is no motor carrier truck line operating in common carriage between Jacksonville and Marianna and between Tampa and Tallahassee, although in all other sections of Florida there are from two to four truck lines giving service. It was contended by these witnesses that they should be furnished the services of a common carrier truck line in this territory so that they might be able to compete with distribution centers such as Savannah, Birmingham, Atlanta, New Or-

leans and Mobile which now have access by motor carrier freight service in interstate commerce into Tallahassee and West Florida. They also contended that this application should be granted in order to furnish a more expeditious transportation service into Tallahassee and Marianna, and that by reason of this lack of common carrier truck service they had not only been unable to expand and reach new territory and new customers in this particular territory but that they had actually lost business.

"It was also shown that the First Class rate from Atlanta, Georgia, to Tallahassee, Florida, is $1.34; from Birmingham to Tallahassee $1.39; and from Savannah, Georgia to Tallahassee $1.21—while from Tampa to Tallahassee the First Class rate is $1.44. By reason of these differences in rates Tampa wholesalers are shut out of this territory. It is true that the applicant can handle Tampa tonnage into Tallahassee over its present interstate route but it would be necessary for the tonnage to move through Jacksonville, Waycross, Thomasville and thence into Tallahassee, and freight shipped from Tampa over this circuitous interstate route would have to lay over in Jacksonville and would not be delivered in Tallahassee until early the second morning out of Tampa.

"The mileage over the applicant's interstate route from Tampa to Tallahassee is 456 miles while the proposed intrastate route mileage would be 254 miles—a saving of 202 miles. On account of this difference in mileage, if the present application is granted, the applicant proposes a schedule that would leave Tampa at 6:00 P.M. and arrive Tallahassee 2:40 A.M., the same night or early the next morning. Shippers out of Tampa and Jacksonville have a similar difficulty in reaching points between Tallahassee and Marianna

and between Tallahassee and Live Oak as all of these shipments are routed via the circuitous interstate route. Not only does this delay the arrival of the goods but requires a higher rate.

"It is shown by applicant's Exhibit No. 40 that in the event this application is granted savings would result to all of the shippers now using its service. For instance, taking a few representative points, the savings per hundred pounds of First Class freight would result as follows:

"Between Arcadia and Marianna _____ 20 cents
Between Gainesville and Tallahassee ____ 13 cents
Between Ocala and Marianna _____ 17 cents
Between Ocala and Tallahassee _____ 17 cents
Between Sarasota and Greenville _____ 20 cents
Between Tampa and Marianna _____ 18 cents
Between Tampa and Tallahassee _____ 19 cents

"5. It was further shown by the applicant that between August 1, 1938 and July 31, 1939 practically three million pounds of freight originated in Florida, largely in Jacksonville, and was hauled by the applicant through Thomasville, Georgia to Tallahassee, Florida, and twenty-six other destination points including Live Oak, Madison, Perry, Quincy, Marianna and points west of Marianna. It also shows that from August 1, 1939, to December 31, 1940, a total of 3,545,159 pounds of freight was handled in the same way. About half of this traffic moved to Tallahassee proper and the balance went to other West Florida points. The applicant contended that the movement of this more than Six Million pounds of freight from Jacksonville to Tallahassee and other points in Florida was an indication that shippers desired truck service into these points and that a more direct route resulting in

saving of mileage and saving in rates would be in the interest of the public.

"6. Protestants to the granting of this application also produced a number of witnesses who testified as to the adequacy of the present facilities. Central Truck Lines, Inc., produced witnesses who testified that its service between Tampa, Brooksville and Inverness was adequate and that there was not sufficient tonnage along this line to warrant another truck line. Further testimony was presented to show that Central Truck Lines, Inc., also served Ocala, and that through its connection with the University City Transfer Company could serve all points between Ocala and Cross City. This Company was vitally interested in the proposed service between Jacksonville and Live Oak and between Tampa and Ocala.

"The rail lines and Railway Express Agency also produced evidence as to their operations, and read into the record the schedule of their companies between various points, and claimed that they were able, ready and willing to furnish all service necessary. They also produced witnesses living in the territory and along the line proposed to be served who testified that they had used this service, were satisfied with it and felt no additional service was necessary.

"K. & L. Transportation Company operates a daily over-night truck service between Jacksonville and Tallahassee via Thomasville in interstate commerce. The tonnage it transports moves directly from Jacksonville to Tallahassee, and it claims its service is entirely adequate so far as Tallahassee is concerned, and that it would be seriously injured if this application is granted.

"7. The Commission has carefully considered the record and briefs filed by all parties of interest. It

recognizes that this is an important case and its correct adjudication will have an important bearing on transportation in a large section of this State and for this reason it has attempted to give every phase of the matter careful thought. In its decisions upon applications of this kind it has always been guided by public convenience and necessity in relation to other transportation in the territory involved. The determination of the question of public convenience and necessity depends in large measure upon the facts of each case. Times change. Facts and conditions often change with the times. This is especially true in the transportation field in which great progress has been made. Orders and decisions denying motor carrier applications made ten years ago or more and bottomed on adequacy of existing modes of transportation cannot stand the test of present day advancement and progress in the motor carrier industry.

"The carrier by motor vehicle has now taken its place in the sun and plays a very important part, not only in the State but in the Nation transportation system. The public in all sections of the State are entitled to have the benefit of the very best transportation agencies. It is also entitled to have the benefit of the services of all modes of transportation if it so expresses itself, and the furnishing of such service will result in greater benefit to the whole public than in loss to the present and existing modes of transportation. The record in this case abundantly supports this statement.

"The Commission finds:

"(a) That the applicant has been operating in interstate commerce a daily service between Atlanta and Tampa via Tallahassee and between Tallahassee and Live Oak and between Tallahassee and Marianna since

October 1935. That it is now serving in interstate commerce transporting interstate freight to and from *every point* sought to be served in intrastate commerce by this application. Schedules between Tampa and Tallahassee and between Live Oak and Marianna are operated daily. The only new schedule is that between Jacksonville and Tallahassee and that portion of this schedule between Baldwin and Live Oak the applicant proposes to serve with closed doors to protect Central Truck Lines, Inc., which operates on this route.

"(b) That the applicant now maintains company owned terminals in Jacksonville and Tallahassee and Tampa and commission agencies are provided in most of the towns and cities sought to be served. It would not be necessary to set up any new terminals nor agencies to operate in intrastate commerce. This would result in economy of operation which is a factor to be considered by the Commission.

"(c) That no common carrier truck line operates in intrastate service between Live Oak and Marianna, and all of the great amount of traffic moving over applicant's present route from Jacksonville to Tallahassee is subjected to an excess haulage of fifty-four miles; the traffic moving to Monticello must be hauled eighty miles out of the way and that from Jacksonville to Madison is subject to an excess haulage of one hundred and ten miles. This is true of other points intermediate to Live Oak and Tallahassee.

"Traffic hauled from Tampa to Tallahassee and to West Florida is also now subjected to excess haulage as the mileage from Tampa to Tallahassee over the present interstate route is four hundred and fifty-six miles while the proposed intrastate route is two hun-

dred and fifty-four miles, a difference of two hundred and two miles.

"(d) That Florida traffic should not be subjected to such a circuitous route nor its shippers required to pay excess freight rates. This is especially true when the desired result can be obtained without further burden on the highways and by simply requiring an interstate operator to open the doors of its motor vehicles to intrastate traffic.

"(e) That the applicant now serves in intrastate commerce Jacksonville and Baldwin and since this order will require it to operate with closed doors between Baldwin and Live Oak, the effect upon other carriers serving between Jacksonville and Live Oak will be negligible compared to the benefits to be derived from this service by all communities between Jacksonville and Marianna.

"(f) That while a segment of the route between Tampa and Tallahassee is being served in intrastate commerce by motor vehicle, and all points are served by rail and express, there exists on the entire route no direct nor through service which will enable shippers of Tampa to reach the Tallahassee and West Florida area with fast and economical carriage.

"(g) That public convenience and necessity require the granting of the application.

"Wherefore, it is Considered, Ordered and Adjudged by the Railroad Commission of the State of Florida that the application of Flamingo Truck Lines, Inc., of Jacksonville, Florida, for an extension of its Certificate of Public Convenience and Necessity to operate in intrastate commerce as a common carrier of freight between the Georgia-Florida State Line and Tampa,

Florida, serving Tallahassee, Perry, Cross City, Williston, Ocala, Hernando, and Brooksville and intermediate points using State Highways Nos. 10, 500, 5, 81, and 74 (U. S. Highways Nos. 319, 19 and 41) with alternate routes between Williston and Hernando and between the junction of State Highways Nos. 74 and 81 to Dunnellon and Hernando over State Highways Nos. 81 and 5; between Tallahassee and Live Oak over State Highway No. 1 (U. S. Highway 90) serving all intermediate points, between Tallahassee and Marianna using State Road No. 1 (U. S. Highway 90) serving all intermediate points; and between Jacksonville and Tallahassee over State Highway No. 1 (U. S. Highway No. 90) with closed doors between Baldwin and Live Oak, be and the same is hereby approved.

"It is further Ordered that service over these routes shall be furnished in accordance with schedules attached to the application.

"Done and Ordered by the Railroad Commission of the State of Florida, in session at its office in the City of Tallahassee, Florida, this 24th day of June, 1941."

Petitioner states in the brief filed three questions for our consideration, the second question being divided in three parts, (a), (b) and (c), which are as follows:

"Question One.

"Did the applicant, Flamingo Truck Lines, Inc., prove, as required by statute, public convenience and necessity for the granting of its application for a certificate of public convenience and necessity to operate in intrastate commerce as a common carrier of freight by motor vehicle between the Georgia-Florida State Line and Tampa, Florida, serving Tallahassee, Perry,

Cross City, Williston, Ocala, Hernando and Brooksville and all intermediate points; and between Tallahassee, Florida, and Jacksonville, Florida, over State Highway Number One and U. S. Highway Number Ninety; and between Tallahassee, Florida, and Marianna, Florida, over State Highway Number One and U. S. Highway Number Ninety. The portion of the route between Baldwin and Live Oak, Florida (over State Highway Number One, U. S. No. 90 ) to be operated with closed doors?"

"Question Two.

"(a) Did the applicant prove, in accordance with law, public convenience and necessity for an operation in intrastate commerce by motor vehicle between the Georgia-Florida State Line and Tampa, Florida?

"(b) Did the applicant prove, in accordance with law, public convenience and necessity for an operation in intrastate commerce by motor vehicle as between Tampa, Ocala, Hernando and Brooksville?

"(c) Did the applicant prove, in accordance with law, public convenience and necessity for an operation in intrastate commerce by motor vehicle as between: 1. Jacksonville and Live Oak; 2. Jacksonville and Tallahassee; 3. Jacksonville and River Junction; 4. Tallahassee and Marianna?"

"Question Three.

Did the Commission, pursuant to statute, first consider, determine and require the several carriers previously serving the points, places and localities sought to be served by the applicant, that the carriers so serving should render better and/or additional services to such points, places and localities to better such service prior to or as an alternative to granting the

application sought by the respondent Flamingo Truck Lines, Inc.?"

The Railroad Commission contends that the question to be determined is:

"Did the Railroad Commission in its order No. 1478 awarding to the applicant, Flamingo Truck Lines, Inc., extension of its Certificate of Public Convenience and Necessity authorizing it to operate in intrastate commerce as a common carrier of freight by motor vehicle between the Georgia-Florida State line and Tampa, Florida, and between Jacksonville and Marianna, Florida, so far fail to observe the essential requirements of law that such order should be reviewed in this Court by Certiorari?", while Flamingo Truck Lines, Inc., states no definite questions to be determined, but argues the matters presented by petitioner.

It appears to us that question Three propounded by Petitioner is no more than a repetition of Questions One and Two.

In the case of Great Southern Trucking Co. v. Douglass, et al., Railroad Commission, opinion filed June 27, 1941, reported 3 Sou. (2nd) 526, we said:

"Where a statute confers upon an administrative board, or commission or officers, administrative authority and duties of a quasi-judicial nature, and where as in this case the statute provides that the orders, rules and regulations duly made by such administrative boards, commissions or officers shall be prima facie reasonable and just or proper to be made under the authorizing statutes, such rules, orders and regulations so duly made will not be quashed on a common law writ of certiorari, when the proceedings by such board, commission or officers are within the authority conferred and are substantially as author-

ized or required by controlling law, and there is ample legal evidence in the record as properly made to sustain the findings, and no law is violated in the making or enforcement of such rules, orders or regulations. In proceedings on certiorari the petitioner has the burden of showing that the order, rule or regulation complained of is illegal or unauthorized or does not accord with the essential requirements of the law controlling the particular matters being reviewed. See Florida Motor Lines, Inc., v. Railroad Commission, 101 Fla. 1018, 132 Sou. 851."

On the showing made it appears that there is substantial evidence in the record to support the findings of the Commission as hereinbefore set forth and, therefore, we may not substitute our conclusions in lieu of the findings of the Commission.

A showing that with present facilities freight may be shipped from any given point and, in time, arrive at another given point does not meet the requirements of present day transportation, or the reasonable demands of commerce. This is a time when the commerce of the world demands prompt, direct and undelayed handling of all things in transportation and that with as few changes from one carrier to another as can reasonably be accomplished. It may reasonably be said that a delay of twenty-four hours in transportation of articles of commerce today is more hurtful to the shipper and consignee of goods and merchandise than a delay of a week in the transportation of like merchandise would have been ten years ago. It, therefore, follows that the shipper is not only entitled to transportation service which will put his shipment moving without any reasonably avoidable delay but he is entitled to have the shipment delivered without any

reasonably avoidable delay with the elimination of all possible rehandling incident to changes in carriage and at the minimum available cost of transportation. See Pennsylvania Ry. v. U. S. 40 Fed. 921; Texas v. U. S., 292 U. S. 522; New York Central S. Corp. v. U. S., 289 U. S. 12.

So, in the absence of showing that in the entering of its Order the Commission abused its authority or acted arbitrarily, the findings and conclusion of the Commission will not be set aside on certiorari, even though the reviewing court might have reached a different conclusion on the evidence. See Interstate Commerce Comm. v. Union Pac. Ry. Co., 222 U. S. 541, 547, 32 S. Ct. 108, 56 L. Ed. 308; Tagg Bros. v. U. S., 280 U. S. 420, 442, 50 S. Ct. 220, 74 L. Ed. 524, 536; People of State of New York v. McCall, 245 U. S. 345, 38 S. Ct. 122, 62 L. Ed. 337; State ex rel. v. Fla. East Coast Ry. Co., 67 Fla. 83, 57 Sou. 175; New Eng. Divisions Case (Akron, C. & Y. R. Co. v. U. S.), 261 U. S. 184, 43 S. Ct. 270, 67 L. Ed. 605; Fla. Motor Lines v. State R. R. Comm., 101 Fla. 1018-1044, 132 Sou. 851.

It is left for us to adjudicate whether or not the Commission's Order based upon its findings comports with the essential requirements of the law. It is urgently contended by the petitioner that the Railroad Commission in entering its Order, supra, disregarded provision of Section 3, Chapter 14674, Acts of 1931, the same being Section 1335 (3) Cumulative Supplement C.G.L., which is as follows:

"When application is made by an auto transportation company for a certificate to operate as a common carrier, in a territory or on a line already served by a certificate holder, the Commission shall grant same

only when the existing certificate holder or holders serving such territory fail to provide service and facilities which may reasonably be required by the Commission."

In Union Bus Co., et al., v. Douglass, etc., 123 Fla. 292, 166 Sou. 582, we said:

"A certificate of public convenience and necessity may properly be granted to operate a new service shown to be required to meet the public need, even though such new service is over a route already being adequately served by the holder of an earlier certificate, where it appears that such new service has been so restricted by the limitations imposed upon it by the Commission that the subsequent applicant will be precluded from rendering a competing service already covered by the certificate of the prior holder, and where the public convenience and necessity requires that the route of the new service be in part over common route already served by an earlier licensee in order to make it adequate to meet the needs of communities proposed to be accommodated by the new service. Lykins v. Ohio Public Utilities Commission, 116 Ohio 740; 158 N. E. 171, P.U.R. 1926-A 396; Bartionville Bus Line v. Eagle Motor Coach Line, 326 Ill. 200, 157 N.E. 175; P.U.R. 1927-E 333."

The Order and findings of the Commission reflect that the Commission recognized that certain segments of the routes in controversy were served by motor vehicles and that practically all points on such routes were served by rail and express' transportation. It further recognized, however, that the applicant served each and every of the points involved in interstate commerce and that to allow applicant to serve those same points in intrastate commerce would create no

additional hazard on the road and that the public would be best served by allowing applicant to open its doors to intrastate commerce.

So it appears that this applicant was not seeking to establish service in new territory, but was seeking to establish additional service to be rendered to patrons at the same points and over the same routes at and on which it was already authorized to render interstate service. Therefore, this applicant was a transportation company applying for a certificate to render service in its operation as a common carrier in a territory and on a line already served in another field of operation by the applicant.

We reach the conclusion that the Commission did not depart from the essential requirements of the law when it failed to consider the provisions of Section 3 of Chapter 14764, supra, a bar to the granting of the certificate here under consideration. We can find no reason in law, or fact, upon which could be logically based a refusal of the Railroad Commission to allow a certificated carrier who under its certificate may receive a box of oranges at Brooksville to be carried to a consignee in Thomasville, Ga., on a route passing through Williston, Bronson, Chiefland, Cross City, Perry and Tallahassee, to at the same time allow that carrier to transport a like box of oranges from Brooksville to a consignee at Williston, Bronson, Chiefland, Cross City, Perry or Tallahassee when the record shows that there is no other certificated transportation company authorized to transport either of such boxes of oranges directly and over the shortest practical route from Brooksville to either of the named points of destination. That is what the relators con-

tend the Railroad Commission should have done in this case.

Relator contends that the element of rates and, therefore, the reduction of costs to the shipping public, is not involved in this case. It is true, the question of rates is not to be adjudicated in this case, but the Commission found that the operation under the certificate applied for would reduce the cost of transportation under existing rates, which finding is supported by the record. This factor was considered as important in the cases of Pennsylvania Ry. v. U. S., supra.; Texas v. U. S., supra; New York Central S. Corp. v. U. S., supra; and, therefore, we think this factor was properly considered by the Commission.

On the whole record, we do not find reflected any departure from the essential requirement of the law. Therefore, the writ of certiorari is granted and quashed.

So ordered.

WHITFIELD, TERRELL, CHAPMAN, THOMAS and ADAMS, JJ., concur.

BROWN, C. J., dissents.

BROWN, C. J., dissenting:

I dissent upon the authority of Seaboard Airline R. Co. v. Wells, et al., 100 Fla. 1027, 130 So. 587; Central Truck Lines v. Railroad Commission, 118 Fla. 555, 160 So. 26; Union Bus Co. v. Douglass, et al., 123 Fla. 292, 166 So. 582. I think that if the majority of the Railroad Commissioners had applied the principles laid down in the above cases they would have reached a different conclusion. The Commission must have realized that they were departing from these older cases, when they stated in the majority opinion that:

"Orders and decisions denying motor carrier applications made ten years ago or more and bottomed on adequacy of existing modes of transportation cannot stand the test of present day advancement and progress in the motor carrier industry." The truth is, as I see it, that the principles laid down in those cases are as sound and practical today as they were when they were written. For under these principles the motor carrier industry has prospered and progressed. The majority opinion of the Commission naively admits this, when in the very next sentence it observes: "The carrier by motor vehicle has now taken its place in the Sun, and plays a very important part, not only in the State, but in the National transportation system." Furthermore, it appears that the Commission has entirely overlooked the prohibition, in Section 3 of Chapter 14,764 against granting probably destructive competition to invade a territory already served by an existing carrier except where the existing carrier first fails to furnish the service and facilities which may reasonably be required by the Commission.

For these reasons I dissent.