## TAGG BROS. & MOORHEAD ET AL. *v.* UNITED STATES ET AL.

No. 45. Argued October 23, 1929.—Decided February 24, 1930.

422

*Messrs. Francis A. Brogan* and *James M. Beck,* with whom *Messrs. Alfred G. Ellick, Anan Raymond, J. S. Boyd,* and *Challen B. Ellis* were on the briefs, for appellants.

428

*Assistant to the Attorney General O'Brian,* with whom *Solicitor General Hughes* and *Messrs. George C. Butte, H. B. Teegarden* and *Charles H. Weston,* Special Assistants to the Attorney General,· were on the brief, for appellees.

Mr. Justice Brandeis delivered the opinion of the Court.

The Packers and Stockyards Act, August 15, 1921, c. 64, §§ 301-316, 42 Stat. 159, 163-168; U. S. C., Tit. 7, §§ 201-217, declares that persons engaged in the business of buying or selling in interstate commerce livestock at a stockyard on a commission basis are "market agencies"; requires such agencies to furnish their services upon reasonable request, without discrimination and at reasonable rates; and confers upon the Secretary of Agriculture the power to determine what are the just and reasonable rates or charges for their services. The Secretary prescribed a tariff of maximum charges for such services at the Omaha Stockyards, effective January 1, 1927. This suit was brought in the federal court for Nebraska, under § 316, to enjoin the enforcement of that order and to set it aside. Fifty-eight concerns, all registered under the Act as such market agencies, and together comprising the entire membership of the Omaha Livestock Exchange, joined as plaintiffs. The United States, the Secretary of Agriculture, the Attorney General and the United States Attorney for Nebraska were made defendants. The prayers were that the order be declared null and void and that the defendants be enjoined from enforcing it by canceling the registration of the agencies, or by instituting proceedings to enforce the penalties prescribed by the Act for violation of an order, or by other means. There were also prayers for a restraining order and for an interlocutory injunction. Compare *Stafford* v. *Wallace,* 258 U. S. 495.

The occasion for the Secretary's order was this. There is no competition among the Omaha market agencies as to rates, since the Exchange rules require all members to

make the same charges for their services. As required by § 306 of the Packers and Stockyards Act, the Omaha market agencies had filed with the Packers and Stockyards Administration at Washington a schedule of charges known as Omaha Livestock Exchange Tariff No. 1. On January 16, 1926, they filed a new schedule, known as Tariff No. 2, which introduced higher rates to become effective January 26, 1926. The Secretary of Agriculture, acting on his own motion, issued, on January 25, an order suspending the operation of the proposed schedule; and gave to the market agencies and others concerned notice of public hearings to be held before an examiner of the Packers and Stockyards Administration, under Title III of the Act, to inquire into the reasonableness of the new schedule.[1]

The hearings before the Examiner extended over many months. The market agencies participated through counsel, but introduced little evidence. The Government introduced much. The evidence before the Secretary occupies, in condensed form, 532 pages of the printed record. It consists of the testimony of 33 witnesses and 102 exhibits, including 59 special audits of the books of the several plaintiffs. Upon that record and the report of the Examiner, the case was argued orally by counsel before the Secretary. He made a report which occupies 20 pages of the printed record. His order was based on the findings therein contained.

The application for an interlocutory injunction was made before three judges, pursuant to the provisions of the Urgent Deficiencies Act of October 22, 1913, c. 32, 38 Stat. 208, 219–20, U. S. C., Tit. 28, § 47, which, by § 316 of the Packers and Stockyards Act, are made applicable to proceedings brought to restrain or annul orders of the

---

[1] As the Secretary's power to suspend a tariff pending a hearing is limited by § 306 to a period of sixty days, Tariff No. 2 became operative on March 27, 1926.

Secretary. *Stafford* v. *Wallace,* 258 U. S. 495, 512. At that hearing, the Government consented that the interlocutory injunction should issue. Upon the filing of the answer, a special master was appointed by the three judges to hear the evidence and report his conclusions to the court. The master admitted, in addition to the record before the secretary, oral evidence which, in condensed form, occupies 84 pages of the printed record, and 24 elaborate exhibits. Relying in part on this new evidence, he recommended that the injunction be made permanent. The case was then heard by the three judges on final hearing, upon exceptions to the master's report and a motion to confirm. That court also held the additional evidence admissible. After considering it in connection with that which had been introduced before the Secretary, the court found for the defendants and entered a final decree dissolving the interlocutory injunction and dismissing the bill. 29 F. (2d) 750. The District Judge allowed an appeal to this Court under § 238 (4) of the Judicial Code, as amended by the Act of February 13, 1925, c. 229, 43 Stat. 936, 938, U. S. C., Tit. 28, § 345 (4).[2]

The plaintiffs conceded below that, being engaged in interstate commerce at public stockyards, they are subject to some regulation by Congress. But they claimed that the order is void, in whole or in part, on five grounds. That the Act does not purport to confer upon the Secretary power to issue an order prescribing commission charges for market agencies and directing their observance in the future. That, if the Act be construed as confer-

---

[2] In doing so, he also approved an appeal bond to operate as a supersedeas and granted a temporary injunction pending the appeal. This part of the order, being beyond the power of a single judge, was later vacated by him. *Cumberland Telephone & Telegraph Co.* v. *Louisiana Public Service Commission,* 260 U. S. 212. An application for a stay made to the three judges was denied on February 11, 1929. It was not until then that the rates which had been prescribed by the Secretary on November 19, 1926, became operative.

ring such authority, it exceeds the constitutional power of the Federal Government, because it is not a regulation of commerce, and violates the Fifth Amendment, because the charges to be fixed are those for personal services. That so much of the order as reduces the charges below those of Tariff No. 1 is void, because it was outside the scope of the Secretary's inquiry as defined in the notice given by him.. That the evidence presented to the Secretary was not sufficient to establish that the charges contained in either Tariff No. 1 or Tariff No. 2 were unreasonable or discriminatory; or that the schedule prescribed by the Secretary would adequately compensate the market agencies for their services and disbursements. That the rates in force prior to the hearing were not excessive, unreasonable or discriminatory; and that the charges prescribed by the Secretary are unreasonable and confiscatory.

In this Court twenty-seven specific errors are assigned, although some were not pressed in argument. One assignment attacks the construction given to the Act. One attacks its constitutionality insofar as it purports to authorize the Secretary to fix plaintiffs' commission charges. Fifteen assignments attack the findings of the Secretary on the grounds that the evidence before him was not sufficient to sustain them, or that he erred in making specific findings, or that he erred in ruling on the admissibility of evidence and on the effect given to evidence, or that he erred in his processes of reasoning. Seven relate to the lower court's treatment of the additional evidence introduced before the master. One assignment attacks the legality of the order, insofar as it reduces the charges below those of Tariff No. 1, on the ground that it was beyond the scope of the inquiry. One attacks the order on the ground that it is confessedly confiscatory as to some of the plaintiffs and cannot be sustained except by fixing the number of plaintiffs entitled to carry on the

business, or by eliminating some plaintiffs for the purpose of increasing the compensation of those remaining. And one assignment attacks the order on the ground that it is confiscatory as to all the plaintiffs.

*First.* . The contention that Congress did not purport to empower the Secretary to issue an order prescribing the charges of market agencies is without substance. The language used was apt to confer the power. The Committee of the House declared in terms that it did so, when it reported the bill.[3] The executive department charged with the duty of enforcing the Act so interpreted it. This Court assumed in *Stafford* v. *Wallace,* 258 U. S. 495, 514, and *Chicago Board of Trade* v. *Olsen,* 262 U. S. 1, 34, that the power had been conferred. The *Maximum Rate Cases,* 162 U. S. 184, 167 U. S. 479, 168 U. S. 144, upon which appellants rely, lend no support to their contention.

The order here in question resulted from a proceeding begun under Title III, § 306. Subdivision (a) of that section requires the agencies to file with the Secretary their schedules of rates. Subdivision (e) authorizes the Secretary, upon complaint or on his own motion, to suspend a new rate pending a hearing as to its lawfulness; and, after the hearing, to make such order with reference thereto as would be proper in a proceeding initiated after the rate had become effective. Subdivision (g) makes any agency which fails to comply with any order made under this section liable to a penalty recoverable in a

---

[3] Report No. 77, 67th Congress, First Session, on H. R. 6320, states at p. 10, referring to Title III: ". . . the Secretary of Agriculture is given substantially the same jurisdiction over stockyard matters which the Interstate Commerce Commission has over railroads, including the power, after full hearing, to establish and enforce just and reasonable rates and charges for, and practices in connection with, the furnishing of stockyard services." By the definitions contained in § 301 (b) and (c), the term " stockyard services " includes . the services rendered by the plaintiffs.

civil action; and subdivision (h) provides for a fine and imprisonment in cases of wilful violation.

Section 310 of the same Title provides that whenever, after a full hearing, the Secretary is of opinion that any rate " of a stockyard owner or market agency " is unreasonable, he may (a) fix the charge to be thereafter observed and (b) make an order that " such owner or operator "·shall not thereafter " collect any rate or charge for the furnishing of stockyard services other than the rate or charge so prescribed." Plaintiffs urge that subdivision (a) confers only the power to declare what rates shall be reasonable, and that this declaration is effective only for purposes of reparation, as *prima facie* proof of such claims; that the power to compel observance of such rates in the future by enforcement of the penalties provided in § 314 is granted solely in subdivision (b); that this subdivision applies only to owners or operators of stockyards—not to all market agencies; and that, therefore, they are entitled to an injunction against the enforcement of the penalties, even though such injunction would not finally dispose of this litigation.

The argument is highly strained. There is nothing in § 310, or elsewhere in the Act, evidencing a purpose to exclude market agencies from subdivision (b), and to restrict the power of regulation to but a part of the " stockyard services." The term " operator " in § 310 (b) is an apt designation of one who conducts a market agency at a stockyard. An operator of a stockyard is covered by the word " owner " under the express definition in § 201 (a).

*Second.* The contention that the Act, if construed as authorizing the order assailed, is void under the due process clause, is likewise unsound. It rests upon the fact that the services for which the Secretary's order fixes the charges are practically the personal services of brokers,

Some of the market agencies are corporations; some partnerships; some are individually owned. The capital needed in the conduct of their business is small. It is said that the business is wholly one of skill and labor, and that the commission man's only implements of trade are a horse on which he rides in the stockyards and a desk on which he keeps his accounts. The Union Stockyards are owned by a separate corporation in which the plaintiffs have no interest and which has no interest in the commissions charged by them. But each agency occupies a certain space in the yards and Exchange building, for which an annual or monthly rental is paid. When a producer wishes to sell his live stock on the Exchange, he ships it by rail or motor truck, or drives it on foot, to an agency at the stockyards. After the stock is unloaded, it is driven by the agency to its pens, sorted, watered, fed and offered by it for sale. The feed is provided by the stockyards corporation on order of the agency and a separate charge is made therefor by the corporation. When a purchaser is found, the stock is driven to the yard scales and weighed. Responsibility passes to the purchaser, or to the agency acting for him, as the stock is taken off the scales. Shipments are generally sold on the day of delivery and payments are made on the same day or the next morning. The agency remits the proceeds to the shippers at once, after deducting its commissions, freight, yardage, feed, inspection and other charges.

The argument is that to prescribe a common maximum of earning power for commission men, who differ between themselves in the length of their experience, their relative aptitude for the work and their individual industry, is to penalize the skillful for the benefit of the unskillful; that in legislative price-fixing there are vital distinctions, from the constitutional standpoint, between property and the use of property, on the one hand, and personal serv-

ices, on the other; that property originates with the State and reverts to the State, whereas, liberty—freedom to contract as to personal services—is a pre-requisite to the very organization of a government of the people; that it is impossible to ascertain what is a fair return for personal services because liberty, unlike property, has no actual or theoretical equivalent in money; that while property may be taken for a public use upon payment of just compensation, liberty—personal services—may not be so taken except in time of war or as a punishment for crime; that, since personal services can not be taken for a public use, they cannot be said to be dedicated to a public use or devoted to a public service; that this rate-fixing is in essence wage-fixing, since the stockyard services performed by the plaintiffs involve only skill and labor, and that wage-fixing was held to be beyond the power of Congress, *Adkins* v. *Children's Hospital,* 261 U. S. 525; that, even if not obnoxious as an attempt at wage-fixing, the limitation of charges for personal service is precluded by *Tyson & Bro.* v. *Benton,* 273 U. S. 418 and *Ribnik* v. *McBride,* 277 U. S. 350.

It is true that performance of the specific work done by the plaintiffs does not require them to invest extensive capital. But it is essential that they employ the valuable property of the stockyards corporation, for which a charge is ultimately made to the shipper or buyer. The mere division of the stockyard services between the stockyards corporation and the market agencies does not deprive Congress of a power of regulation which it otherwise would have had. But the constitutionality of the power conferred does not rest upon so narrow a ground. There is nothing in the nature of monopolistic personal services which makes it impossible to fix reasonable charges to be made therefor; and there is nothing in the Constitution which limits the Government's power of regulation to businesses which employ substantial capital. This

Court did not hold in *Tyson & Bro.* v. *Banton* and *Ribnik* v. *McBride* that charges for personal services cannot be regulated. The question upon which this Court divided in those cases was whether the services there sought to be regulated were then affected with a public interest. Whether a business is of that class depends, not upon the amount of capital it employs, but upon the character of the service which those who are conducting it engage to render.

Plaintiffs perform an indispensable service in the interstate commerce in live stock. They enjoy a substantial monopoly at the Omaha Stock Yards. They had eliminated rate competition and had substituted therefor rates fixed by agreement among themselves, without consulting the shippers and others who pay the rates. They had bound themselves to maintain uniform charges regardless of the differences in experience, skill and industry. The purpose of the regulation attacked is to prevent their service from thus becoming an undue burden upon, and obstruction of, that commerce. *Stafford* v. *Wallace,* 258 U. S. 495, 515, 516; *Chicago Board of Trade* v. *Olsen,* 262 U. S. 1, 34. There is here no attempt to fix anyone's wages or to limit anyone's net income. Differences in skill, industry and experience will continue to be factors in the earning power of the several plaintiffs. For, the order fixes only the charges to be made in individual transactions.

*Third.* The claim that the order is void for lack of proper notice, insofar as it reduces charges below Tariff No. 1, is unsupported. The contention is that the notice of the hearings before the Examiner and the Secretary did not apprise plaintiffs of the Secretary's intention to fix a new schedule, but led them to believe that the hearings would be confined to the inquiry whether Tariff No. 2 was excessive and that, if it was found to be so, Tariff No. 1 would be left in force; whereas the tariff prescribed

by the Secretary carries rates lower than Tariff No. 1. The notice given by the Secretary was neither defective nor misleading. It informed the plaintiffs that a hearing would be had under Title III of the Act. It apprised them that they would have "the right to appear and show cause why a further order in respect to the said schedule of rates and charges should not be made" pursuant to Title III. Section 306 (e) of that title provides that upon such a hearing the Secretary may make any order with reference to the proposed schedule which he could make in a proceeding initiated after the schedule had become effective. And § 310 of the same title expressly empowers the Secretary in any such proceeding, to fix the just and reasonable rate to be charged in the future, without limiting him to a determination of the lawfulness of a proposed rate. The plaintiffs should have anticipated, therefore, that the Secretary would fix a new rate, if the evidence before him would lead him to believe that such a course was proper and desirable.

*Fourth.* The claim that the order is void because unsustained by the evidence before the Secretary, or because of specific errors in rulings or findings, lacks merit. The Secretary found that monopolistic power was exercised by the plaintiffs without the usually attendant economy of minimizing expenditures for business getting; that the operating costs of the several agencies for the performance of similar services varied widely; that some of the expenses were wasteful and unnecessary; that the profit yielded by Tariff No. 2, on the basis of the estimated reasonable cost of conducting the business, allowing for reasonable salary expenses, advertising costs, overhead, Exchange assessments and dues and interest at the rate of 7 per cent. on the invested capital, was unreasonable; that the Tariff was unduly complicated and confusing, not only to shippers but even to experienced employees of the agencies; that, because of the presence of maximum

and minimum charges, and because of differences in rates based on the mode of delivery of the stock, its effect on different shippers was unjust, inequitable and not based on any reasonable differences in the cost or value of the service performed; that it unjustly favored traders and speculators by prescribing half the regular commission charges for buying and selling for their account; that, for these reasons, the operation of Tariff No. 2 should be suspended and there should be substituted the schedule drawn by the Secretary which prescribed generally lower charges, eliminated the several unjust discriminations and yielded a reasonable return to the plaintiffs above the legitimate cost of their service.

It is urged that there was not sufficient evidence before the Secretary to establish that the charges contained in either Tariff No. 1 or Tariff No. 2 were discriminatory or unreasonable, or that the schedule prescribed by the Secretary would adequately compensate the market agencies for their services and disbursements; that the Secretary confined the fixing of rates to Omaha, although relatively higher rates prevail under substantially similar circumstances in other markets and it was possible to fix rates for all competing markets; that his order is based upon the notion that the industry is suffering from an oversupply of market agencies and that some of the plaintiffs should be eliminated therefrom; that it is based upon irrelevant considerations of the economic condition of plaintiffs' patrons; that it resulted from a complete misunderstanding of the plaintiff's function and a disregard of the really controlling facts of the industry; that the prescribed rates are based upon an assumed cost of the service which disallowed expenses actually incurred and omitted basic cost items such as some additional depreciation, bad debts, supervision, going concern value and additional items of invested capital; and that the revenues estimated to result from the recommended increase of the charges to traders

and speculators will not be realized, because the increase will drive the traders and speculators from the market.

We find in the evidence before the Secretary ample support for the findings and the conclusion reached by him. It may be that some of the evidence was irrelevant or of little weight, and that some of the reasoning was not persuasive. But mere admission by an administrative tribunal of matters which, under the rules of evidence applicable to judicial proceedings, would be deemed incompetent, or mere error in reasoning upon evidence adduced, does not invalidate an order made by it. *United States* v. *Abilene & Southern Ry.,* 265 U. S. 274, 288; *Northern Pacific Ry. Co.* v. *Department of Public Works,* 268 U. S. 39, 44. It has been settled in cases arising under the Interstate Commerce Act that if an order rests upon an erroneous rule of law, *Interstate Commerce Commission* v. *Diffenbaugh,* 222 U. S. 42; or is based upon a finding made without evidence, *Chicago Junction Case,* 264 U. S. 258, 263; or upon evidence which clearly does not support it, *Interstate Commerce Commission* v. *Union Pacific R. R. Co.,* 222 U. S. 541, 547; *New England Divisions Case,* 261 U. S. 184, 203; *Colorado* v. *United States,* 271 U. S. 153, 166, the order must be set aside. These rules are applicable also to suits arising under the Packers and Stockyards Act. But the order here assailed is not subject to any of these infirmities.

*Fifth.* With regard to the assignments of error based on the additional evidence introduced below, a question of practice requires consideration. After the defendants filed their answer, the plaintiffs moved for the appointment of a special master. The only grounds set forth in the motion were these; that the character and volume of the evidence before the Secretary were such that it would require for its due consideration long study and the aid of expert accountants; that it was necessary to take additional testimony from a large number of shippers to the

Omaha market to show that the charges under Tariff No. 2 were satisfactory to shippers and that the charges prescribed by the Secretary would result in injury to the live stock business, by deteriorating the quality of the service; that it was necessary to introduce additional testimony and additional audits to show the effect of the rates prescribed by the Secretary on the business of the year 1926 and their continuing effect on the business of 1927; and that it was necessary to take additional testimony from a large number of the plaintiffs to show that under the application of the rates prescribed by the Secretary, they will be unable to continue in business.

The court granted the motion to appoint the master and authorized him " to rule upon the admission and exclusion of evidence, subject to the court's review of the same." In its opinion on final decree, the court justified the admission of the evidence, and considered the same, on the ground that the notice of the hearings before the Examiner did not advise plaintiffs that the Secretary intended to fix a new schedule of rates. As we have shown above, the court erred in holding that the notice given was inadequate. But if there had been a failure to give due notice, it would have been ground only for setting aside the order without inquiry into its merits, as having been made without notice and hearing. Such failure does not justify trying in the court, upon new evidence, the issues set forth in the motion to appoint the master.

A proceeding under § 316 of the Packers and Stockyards Act is a judicial review, not a trial *de novo*. The validity of an order of the Secretary, like that of an order of the Interstate Commerce Commission, must be determined upon the record of the proceedings before him,— save as there may be an exception of issues presenting claims of constitutional right, a matter which need not be considered or decided now. *Louisville & Nashville R. R. Co.* v. *United States,* 245 U. S. 463, 466; compare

*Liscio* v. *Campbell,* 34 F. (2d) 646, 647; and see *Prendergast* v. *New York Telephone Co.,* 262 U. S. 43, 50 and *Ohio Valley Water Co.* v. *Ben Avon Borough,* 253 U. S. 287, 289. On all other issues his findings must be accepted by the court as conclusive, if the evidence before him was legally sufficient to sustain them and there was no irregularity in the proceeding.[4] To allow his findings to be attacked or supported in court by new evidence would substitute the court for the administrative tribunal as the rate making body. Where it is believed that the Secretary erred in his findings because important evidence

---

[4] The judicial review of rate orders in suits begun under the Urgent Deficiencies Act to set aside orders of the Interstate Commerce Commission does not differ in substance from that in suits instituted by the Commission under the Interstate Commerce Act to enforce its orders. The Act to Regulate Commerce, February 4, 1887, c. 104, § 16, 24 Stat. 379, 384–5, specifically provided that, in proceedings to enforce orders of the Commission, its findings were to be merely *prima facie* evidence; and the Court was not to be restricted to the record before the Commission. *Cincinnati, New Orleans & Texas Pacific Ry. Co.* v. *Interstate Commerce Commission,* 162 U. S. 184, 187, 195–6; *Interstate Commerce Commission* v. *Alabama Midland Ry. Co.,* 168 U. S. 144, 174–5. Compare *United States* v. *Los Angeles & Salt Lake R. Co.,* 273 U. S. 299, 309. The Commerce Court Act, June 18, 1910, c. 309, § 13, 36 Stat. 539, 554–5, amended § 16 and restricted the scope of review as follows: "If, after hearing, that court determines that the order was regularly made and duly served, and that the carrier is in disobedience of the same, the court shall enforce obedience . . ." This is the provision now in force,—U. S. C., Tit. 49, § 16 (12). Reparation orders are still only *prima facie* evidence. U. S. C., Tit. 49, § 16 (2).

Compare *Oregon R. R. & Navigation Co.* v. *Fairchild,* 224 U. S. 510, 525; *Napa Valley Electric Co.* v. *Cal. R. R. Comm.,* 251 U. S. 366, 370; and *Pacific Tel. & Tel. Co.* v. *Kuykendall,* 265 U. S. 196, 200. Also the District of Columbia Public Utilities Law, Act of March 4, 1913, c. 150, § 8, par. 67, 37 Stat. 938, 989; the Valuation Act, March 1, 1913, c. 92, 37 Stat. 701, 703, U. S. C., Tit. 49, § 19a, (b) Fifth (j); and the Federal Trade Commission Act, Sept. 26, 1914, c. 311, § 5, 38 Stat. 717, 719–20, U. S. C., Tit. 15, § 45,

was not brought to his attention, the appropriate remedy is to apply for a rehearing before him or to institute new proceedings. He has the power and the duty to modify his order, if new evidence warrants the change. Compare *Interstate Commerce Commission* v. *Union Pacific R. R. Co.,* 222 U. S. 541, 550. A rate order is not *res judicata.* Every rate order made may be superseded by another.

*Sixth.* There is also a contention that the rates prescribed are not merely unsupported by the evidence, but are confiscatory; and that the order is therefore void. Whether the additional evidence before the master was admissible on the issue of confiscation presents a serious question of practice which was not argued by counsel. The lower court held the additional evidence admissible, and, after considering it, reached the conclusion that the charges prescribed are not unreasonably low or confiscatory. This conclusion of the lower court conforms, in our opinion, to the evidence, whether the examination be confined to that evidence which was received by the Secretary or be extended to include the additional evidence introduced before the master and the court. The question of the admissibility of the additional evidence on the issue of confiscation may, therefore, be passed, and it is passed, without decision.

*Affirmed.*