**Lawrence W. WHITE, Defendant, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 7018.**

United States Court of Appeals
First Circuit.

May 17, 1968.

Kevin M. Keating, Needham, Mass., with whom Joseph S. Oteri and Crane, Inker & Oteri, Boston, Mass., were on brief, for appellant.

John Wall, Asst. U. S. Atty., with whom Paul F. Markham, U. S. Atty., and Albert F. Cullen, Jr., Asst. U. S. Atty., were on brief, for appellee.

Before ALDRICH, Chief Judge, Mc-ENTEE and COFFIN, Circuit Judges

COFFIN, Circuit Judge.

This is an appeal from a conviction based on an indictment in two counts charging defendant with unlawfully,

knowingly and wilfully selling and disposing of a quantity of lysergic acid diethylamide (LSD), a "depressant or stimulant drug" within 21 U.S.C. § 321 (v) (3) [1], to an agent of the Bureau of Drug Abuse Control, Food and Drug Administration, in violation of 21 U.S.C. § 331(q) (2).[2] The indictment contained no allegation that the drugs in question traveled in interstate commerce or that the defendant intended to transport them in interstate commerce.

■ Appellant challenges the constitutionality of both 21 U.S.C. § 331(q) (2) and 21 U.S.C. § 321(v) (3) asserting, as to the former, that the statute exceeds the power delegated to Congress under the Commerce Clause for the reason that it is not expressly limited, or intended to be limited, to matters in, mingled with, or found to affect interstate commerce; and, as to the latter, that the statute defining a "depressant or stimulant drug" and delegating to the Secretary of Health, Education and Welfare authority to classify certain drugs under that rubric is a delegation of legislative authority in violation of Article I, Section 1 of the Constitution.

The 1965 amendments to the Federal Food, Drug and Cosmetic Act of 1938, 21 U.S.C. §§ 301–392, including the two sections challenged here, were sought in order "to provide a much needed strengthening of * * * controls * * available under the [Act] * * * and * * * to provide additional sanctions * * *." Hearings on H.R. 2 Before the House Committee on Interstate & Foreign Commerce, 89th Cong., 1st Sess., at 8 (1965). These amendments were enacted into law during the summer of 1965 based upon congressional findings and declaration of policy that may be reduced to the following propositions: (1) the unsupervised use of depressant and stimulant drugs is a hazard to public health and safety—including safety on the highways—without distinction between interstate and intrastate traffic; (2) there is a widespread illicit traffic in such drugs moving in or affecting interstate commerce; (3) it is impossible to determine whether such drugs, held for illicit sale, often unlabelled, have been in or have affected interstate commerce; (4) therefore, effective regulation of interstate commerce requires regulation of intrastate commerce. 1965 U.S.Code Cong. & Adm.News, p. 241. These findings stem from varied and extensive testimony as to the extent of illegal drug traffic and unauthorized use, the diversion of basic chemicals and finished

---

1. "§ 321 Definitions; generally
For the purposes of this chapter—
    *       *       *       *       *
(v) The term 'depressant or stimulant drug' means—
    *       *       *       *       *
(3) any drug which contains any quantity of a substance which the Secretary, after investigation, has found to have, and by regulation designates as having, a potential for abuse because of its depressant or stimulant effect on the central nervous system or its hallucinogenic effect * * *."
    *       *       *       *       *
"21 C.F.R. § 166.3 Listing drugs defined in section 201(v) of the act.
    *       *       *       *       *
(c) The Commissioner has investigated and designates all drugs * * * containing any amount of the following substances as having a potential for abuse because of their:
    *       *       *       *       *

(3) Hallucinogenic effect:

| Established name | Some trade and other names |
|---|---|
| * * * | * * |
| LSD-25; LSD — | d-Lysergic acid diethylamide." |

2. "§ 331 Prohibited Acts
The following acts and the causing thereof are prohibited;
    *       *       *       *       *
(q) (2) the sale, delivery, or other disposition of a drug in violation of section 360a(b) of this title * * *."
    *       *       *       *       *
"§ 360a Depressant and stimulant drugs—Manufacturing, compounding, and processing; persons exempt from prohibition
    *       *       *       *       *
(b) No person other than—[stated exceptions which do not here apply] shall sell, deliver, or otherwise dispose of any depressant or stimulant drug to any other person."

drugs from legitimate channels of production and distribution, and the physical and mental harm, temporary and long-lasting, resulting from drug misuse. *Hearings,* supra.

█ It is not argued that the congressional purpose is other than a wise and timely response to the evidence adduced at the hearings. The sole question is whether Congress can achieve its purpose through its Commerce Clause power. That Congress may protect legitimate interstate traffic in depressant and stimulant drugs against competition from illicit interstate traffic by forbidding the latter is clear. That it can go so far as to forbid intrastate traffic which is specifically found to affect interstate commerce is also established doctrine. But whether it can forbid the intrastate sale, delivery, or other disposition of the covered drugs, without requiring proof that interstate commerce is affected by the specific transaction, is the question to be resolved here.

The congressional findings reveal two justifications for exercising an across-the-board prohibition. Both speak to the impossibility of the intrastate-interstate distinction as a useful concept in regulating this particular problem. One addresses the inseparability of effect on safety of drug consumption; the other, the inseparability of the problem of regulating distribution. Unlike many other objects of federal regulation, depressant and stimulant drugs are not an inert, passive substance, which, after use, pass into the realm of statistics of consumption. They exert an influence on the consumer, which may spell danger or disaster for people or property from or in other states. As for distribution, Congress has acknowledged that attempts prior to 1965 to regulate proscribed interstate traffic have failed because of the impracticability and impossibility of determining source of origin identification.

We think that Congress has adequately identified a situation where its dual objective of fostering proper interstate commerce and proscribing improper interstate commerce would be aborted without the power to regulate all intrastate commerce. That this is a far-reaching conclusion we acknowledge. We also recognize that it is subject to abuse. But as between allowing exercise to the outer limit of the commerce power in what we deem a proper case and forbidding it because of fears of its use in an improper case, we choose the former, having confidence in the ability of both Congress and the courts to distinguish use from abuse.

The traditional landmark cases under the Commerce Clause, such as Houston, East & West Texas Ry. Co. v. United States, 234 U.S. 342, 34 S.Ct. 833, 58 L. Ed. 1341 (1914); Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942); and Heart of Atlanta Motel v. United States, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964), have upheld the exercise of federal power to protect, foster, and nourish interstate commerce which has implicitly been equated with beneficial activity. For the most part they have been concerned with the quantitative flow of commerce. Other cases, such as Cloverleaf Butter Co. v. Patterson, 315 U.S. 148, 62 S.Ct. 491, 86 L.Ed. 754 (1942); United States v. Walsh, 331 U.S. 432, 67 S.Ct. 1283, 91 L.Ed. 1585 (1947); and McDermott v. Wisconsin, 228 U.S. 115, 33 S.Ct. 431, 57 L.Ed. 754 (1913), have involved exercises of the commerce power explicitly distinguishing between interstate commerce which is beneficial and that which is not. In this case Congress has sought both to encourage a certain kind of quality of interstate commerce and to proscribe a different quality of commerce, whether it be interstate or intrastate.

Though the exercise of the commerce power may transcend earlier precedents, the rationale for that exercise in a case of demonstrable necessity has long been established. In United States v. Darby, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941), the Court upheld legislation requiring that the Fair Labor Standards

Act apply to companies producing goods, some of which were expected to be shipped in interstate commerce. In order to suppress competition in interstate commerce from goods produced under substandard labor conditions, Congress made "no distinction as to the volume or amount of shipments in the commerce or of production for commerce by any particular shipper or producer. It recognized that in present day industry, competition by a small part may affect the whole and that the total effect of the competition of many small producers may be great." Id. at 123, 61 S.Ct. at 461. The Court recognized that the power to regulate commerce "extends not only to those regulations which aid, foster and protect the commerce, but embraces those which prohibit it." Id. at 113, 61 S.Ct. at 456. And it concluded, "Congress, having by the present Act adopted the policy of excluding from interstate commerce all goods produced for the commerce which do not conform to the specified labor standards, it may choose the means reasonably adapted to the attainment of the permitted end, even though they involve control of intrastate activities." Id. at 121, 61 S.Ct. at 460.

In *Darby* the means chosen was to subject to wage and hour requirements the employees of an employer who manufactured his product "with the intent or expectation that according to the normal course of his business all or some part of it will be selected for shipment to [out-of-state] customers." Id. at 117, 61 S.Ct. at 459. Congress had recognized "that it would be practically impossible * * * to restrict the prohibited kind of production to the particular pieces of lumber, cloth, furniture or the like which later move in interstate rather than intrastate commerce." Id. at 118, 61 S. Ct. at 459.

What was a "means reasonably adapted to the attainment of the permitted end"

in *Darby,* i.e., regulatory legislation requiring some proof, admittedly attenuated, of connection with interstate commerce, was specifically declared by Congress in the legislation before us not to be reasonably adapted to control of interstate drug traffic. We deem the response of Congress in forbidding all unauthorized traffic in depressant and stimulant drugs, after having tried milder approaches and having seen their ineffectiveness, no less justified and proper than was its abandonment of case-by-case adjudication of racial discrimination in voting and its enactment of the more stringent remedies of the Voting Rights Act of 1965. State of South Carolina v. Katzenbach, 383 U.S. 301, 313–315, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966).

In *Heart of Atlanta,* supra, while the facts demonstrated considerable involvement of the motel with interstate clientele, the Court was dealing with a statute which declared that any motel serving transient guests affects commerce per se (section 201(c)), and, willing to assume that the motel was of a "purely local character", it stated that "Congress may —as it has—prohibit racial discrimination by motels serving travelers, however 'local' their operations may appear." 379 U.S. at 258, 85 S.Ct. at 358. Mr. Justice Black, concurring, expressed the same thought this way: "[I]n deciding the constitutional power of Congress in cases like the two before us [*Heart of Atlanta Motel* and Katzenbach v. McClung, 370 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964)], we do not consider the effect on interstate commerce of only one isolated, individual, local event, without regard to the fact that this single local event when added to many others of a similar nature may impose a burden on interstate commerce by reducing its volume or distorting its flow." Id. at 275, 85 S.Ct. at 367.[3]

---

3. Cf. United States v. Five Gambling Devices, 346 U.S. 441, 74 S.Ct. 190, 98 L. Ed. 179 (1953). The doubts revealed in this case concerning the reach of con-

gressional power were predicated on the assumption that the information required by the legislation being challenged concerned "acts not shown to be in, or

We therefore hold that in enacting 21 U.S.C. § 331(q) (2) Congress did not exceed its constitutional power. Accord, United States v. Freeman, 275 F.Supp. 803 (D.Ill.1967).

■ Defendant also challenges the validity of 21 U.S.C. § 321(v) (3) on the ground that it constitutes a delegation of legislative power not permitted by Article I, Section 1 of the Constitution. Section 321(v) (3), also part of the 1965 amendments, defines "depressant or stimulant drug", the sale, delivery or other disposition of which is declared illegal by 21 U.S.C. §§ 331(q) (2) and 360a(b), as any drug which the Secretary of Health, Education and Welfare finds after investigation, and declares by appropriate regulation, to have a "potential for abuse" because of its "depressant or stimulant effect on the central nervous system or its hallucinogenic effect". Defendant argues that this delegation is without intelligible guidelines and constitutes an "implicit abdication by Congress of its responsibility to state with clarity why it wants particular acts declared illegal. * * *"

We do not agree. The proscribed traffic is in "depressant or stimulant drugs" which have a "potential for abuse" because of their "effect on the central nervous system or [their] hallucinogenic effect." While we consider this by itself substantially more than a vacant standard, we note that the phrase "potential for abuse" is further illuminated and defined in the legislative history of the drug control amendments.

"The committee feels that a drug's 'potential for abuse' should be determined on the basis of its having been demonstrated to have such depressant or stimulant effect on the central nervous system as to make it reasonable to assume that there is a substantial potential for the occurrence of significant diversions from legitimate drug channels, significant use by individuals contrary to professional advice, or substantial capability of creating hazards to the health of the user or the safety of the community." 1965 U.S.Code Cong. & Adm.News, p. 1899.

See United States v. Shreveport Grain & Elevator Co., 287 U.S. 77, 83, 53 S.Ct. 42, 77 L.Ed. 175 (1932). Other schemes much broader in scope and with less guidance to administrative agencies have been countenanced by the Supreme Court. See, e.g., State of Arizona v. State of California, 373 U.S. 546, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963), decree entered, 376 U.S. 340, 84 S.Ct. 755, 11 L.Ed.2d 757 (1964) (authority to apportion Colorado River Waters within limits but no guidelines); Lichter v. United States, 334 U.S. 742, 68 S.Ct. 1294, 92 L.Ed. 1694 (1948) ("excessive profits"); Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944) ("fair and equitable price fixing"); United States v. Shreveport Grain & Elevator Co., supra ("reasonable variations"); Tagg Bros. & Moorhead v. United States, 280 U.S. 420, 50 S.Ct. 220, 74 L.Ed. 524 (1930) ("just and reasonable rates").

Finally, defendant argues that the Secretary of Health, Education and Welfare is no better suited than the Congress to perform the task of designating drugs which have a "potential for abuse" and, in order to insure that the congressional intent in enacting § 321(v) (3) has been served, the Secretary should not be vested with such authority. Even considering that relative suitability should be relevant, we do not concede defendant's premise. See 1965 U.S.Code Cong. & Adm.News, p. 1895. Of course the Congress can always amend the Act by adding a statutory list of proscribed drugs it finds potentially abusive. But in order to legislate wisely it would still need the

___

mingled with, or found to affect commerce." While the Court disposed of the case by construing the statute narrowly, there seems little doubt that *Heart of Atlanta* goes beyond the dictum in *Gambling Devices* in its willingness in a proper case to approve legislation declaring that certain activities affect interstate commerce per se without requiring proof in each case.

advice of the Department of Health, Education and Welfare. Rapid drug development and increased public experimentation, however, suggest the wisdom of delegation and the inappropriateness of statutory lists.

Affirmed.