**In re S & F Builders, Inc.**

*Hershel Richman,* for Department of Environmental Resources.

*Thomas M. Garrity*, for appellant.

MALIN, Chairman, November 16, 1972.—This is an appeal from an order of the Department of Environmental Resources, Division of Dams and Encroachments, dated February 2, 1972, which denied appellant's applications Nos. 19831 and 19832 for permission to change the course of Pennypack Creek, Upper Moreland Township, Montgomery County, Pa., and a tributary thereof. Application No. 19831 requested permission to change the course of a segment of an unnamed tributary to Pennypack Creek; Application No. 19832 requested permission to change the course of a segment of Pennypack Creek. Both appeals were consolidated for hearing and a hearing was held on April 13, 1972, before M. Melvin Shralow, Hearing Examiner.

## FINDINGS OF FACT

1. Appellant, S & F Builders, Inc., is the owner of an irregularly shaped tract of land containing approximately 88 acres in Upper Moreland Township, Montgomery County, Pa.

2. Appellant has erected 192 units of two-story garden-type apartments on the tract and has plans to erect approximately 488 additional units. The development is known as Blair Mill Village East.

3. The southerly boundary of the tract runs parallel to the general course of a tributary to Pennypack Creek which runs across the tract in snake-like fashion from west to east. Application No. 19831 seeks to reduce the meandering of the tributary by changing its course to fewer and much flatter curves, and to move it southward and closer to the tract boundary and would also reduce the amount of land which borders on the northern side of the tributary and is affected by it. The stream as presently located runs approximately 1,800

linear feet across appellant's property. The relocated stream would run approximately 1,500 linear feet across the property.

4. The eastern boundary of the tract approximates the course of Pennypack Creek, which flows from north to south adjacent to the property and cuts across the eastern-most tip of the tract in an arc. Application No. 19832 seeks permission to reduce the arc of the creek at this point to a very flat curve, thereby reducing the amount of land between the creek and the tract boundary. This relocation involves approximately 275 linear feet of the creek.

5. Appellant's stated purposes for both applications are to reduce the amount of its land which is affected by periodic flooding of Pennypack Creek and its tributary, and to increase the amount of land available for parkland and recreational uses.

6. Appellant complied with all published requirements of the department governing the form of application and the supporting documents and data to be submitted.

7. The department denied the applications by letter of February 2, 1972, which stated:

"Reference is made to your applications filed with the Department of Environmental Resources for permit to change the channel of a tributary of Pennypack Creek and Pennypack Creek in Upper Moreland Township, Montgomery County.

"The proposal has been reviewed by the Pennsylvania Fish Commission and they have objected strenuously to the proposed relocation.

"Since the relocation [sic] proposed are not essential and the proposal would not be in the best interests of the Commonwealth, approval of application file No. 19831 and file No. 19832 cannot be recommended."

8. The opposition of the Pennsylvania Fish Com-

mission was stated in identical memoranda with respect to each application from Jack G. Miller, Chief of the Fisheries Environmental Services Section, dated January 10, 1972. Those memoranda stated:

"The Pennsylvania Fish Commission is opposed to the subject channel change which is for developmental purposes. The area should be used as a park area and the stream left where it is.

"This same company made an unauthorized channel change on the Pennypack and appears to be very reluctant to do anything to compensate for the destruction of the aquatic habitat.

"In view of these reasons, we recommend that this permit request be denied."

9. The department agrees that the second paragraph of Mr. Miller's memorandum is in error, and that the channel change there referred to was an authorized change made pursuant to, and in accordance with, a permit issued by the department.

10. The Pennsylvania Fish Commission is embarked upon a program of upgrading Pennypack Creek so that it will support fish life to the extent that recreational sport fishing will be possible.

11. V. R. Butler, Chief of the Division of Dams and Encroachments of the Department, testified that in reaching his decision on these applications, he considered hydraulic and environmental factors. None of these criteria is contained in any written rules, regulations or standards of the department.

12. Mr. Butler made three visits to this site, and conducted a visual inspection on each occasion. He also was familiar with the results of the earlier channel change referred to in the memorandum of the Fish Commission. Fish life is present in these streams. Moving the streams would cause changes which would result in the destruction of aquatic life, which would

not revert to a natural state for a long period of time, perhaps from 40 to 75 years. The changes would result because the bottom of the new channel would not be hospitable to aquatic life.

13. There has been an upgrading of Pennypack Creek in terms of aquatic and fish life according to samplings of the Pennsylvania Fish Commission.

14. A prior channel change in the area created an unstable channel, indicating a very high probability that the proposed channel would be unstable. Instability means erosion, flooding and a shifting bottom inhospitable to aquatic life.

15. The effect of the stream changes on potential flooding problems would be small enough to be acceptable.

16. The proposed new channel would most likely be unstable. To make it stable would require a concrete channel which would make fish and aquatic life impossible. An unstable channel would make fish and aquatic life impossible.

17. The Commonwealth declined to approve a relocation because of environmental factors which it believes are not solvable. Its position is based on the newly adopted section 27 of Article I, of the Pennsylvania Constitution.

18. Both Mr. Butler and Mr. Miller had stronger objections to Application No. 19831 than to Application No. 19832, but this distinction was not communicated to appellant.

19. Specific environmental and hydraulic grounds for denying the applications were not given to appellant prior to the hearing. Appellant submitted no data on the effect of the stream change on aquatic life.

20. The department does not have specific regulations which tell an applicant what hydraulic factors will be acceptable or unacceptable in judging an appli-

cation. Hydraulic data are requested, but no criteria are established for evaluating the data.

21. No hydraulic data other than those submitted by appellant were requested in this matter. No hydraulic tests concerning these streams were requested or conducted by the department.

22. The department does not have regulations which establish criteria for judging the environmental effects of an application for stream relocation. There is no requirement by regulation for the submission of, nor was applicant in this case requested to submit, any environmental data. The only notice to appellant that environmental factors with respect to fish life were a factor was the statement contained in Exhibit C-1: "On some streams, a low flow channel may be required to provide a satisfactory channel to maintain fish life." Such a statement indicates that stream velocity and its effect on aquatic life are factors to be considered.

23. The department itself conducted no environmental surveys of these streams and had no environmental data other than the statement supplied to Mr. Butler by the Pennsylvania Fish Commission. The department did not use water quality criteria, if any have been established for these streams, did not conduct a biological survey of aquatic life, and made no survey of the vegetation in the area other than as observed by Mr. Butler in his walks along the streams. No data were assembled to predict what hydraulic or environmental changes would be likely to occur as a result of the proposed relocations.

24. The factors involved in changing the regimen of a stream are virtually identical with standards applied at common law for changes affecting the rights of riparian owners and include:

1. Erosion of soil.

2. Increased costs of water treatment by downstream riparian owners.

3. Possibilities of flooding.

4. Destruction and failure of natural propagation of fish, aquatic resources and wildlife and interference with downstream or public recreational uses.

5. Loss of water for beneficial uses and purposes by downstream owners.

6. Water pollution.

7. Increases in turbidity.

8. Deposition of silt and debris.

9. Increases or decreases in water velocity.

10. Increases or decreases in temperature of waters.

11. Increases or decreases in level of waters.

12. Necessity of the change for the reasonable use of the property by the party seeking to change the channel.

25. The improvement of the area for recreational purposes resulting from the change would, at best, be marginal. The department was of the opinion that the channel change would do little to enhance the recreational potential of the area and that very little if anything at all would be accomplished at the expense of sterilizing substantial segments of the Pennypack and its tributary for the possibility of the growth of aquatic life.

26. Appellant was first advised of the department's concerns over the effect of the change on channel stability, soil erosion, and fish life at the hearing in this matter. The board offered to hold further hearings to give appellant an opportunity to reply to and meet the department's objections and offer further justification for the change, but appellant declined to do so having no further evidence to offer.

## DISCUSSION

### I

The Water Obstructions Act of June 25, 1913, P. L. 555, as amended, 32 PS §681, et seq., makes it unlawful to change or diminish the course, current or cross section of any stream without the consent or permit of the Water and Power Resources Board.[1] By section 20 of the Act of December 3, 1970, P. L. 834 (No. 275), section 1908A of the Administrative Code was enacted and transfers this function to the Department of Environmental Resources ("department").

Section 3 of the act[2] authorizes the department to

----

[1] 32 PS §682: "Obstructions not to be made or altered without consent

"Except as provided herein, from and after the passage of this act, it shall be unlawful for any person or persons, partnership, association, corporation, county, city, borough, town or township to construct any dam or other water obstruction; or to make or construct, or permit to be made or constructed, any change therein or addition thereto; or to make, or permit to be made, any change in or addition to any existing water obstruction; or in any manner to change or diminish the course, current, or cross section of any stream or body of water, wholly or partly within, or forming a part of the boundary of, this Commonwealth, except the tidal waters of the Delaware River and of its navigable tributaries, without the consent or permit of the Water and Power Resources Board, in writing, previously obtained, upon written application to said board therefor. The director, Bureau of Municipal Services of the Pennsylvania Department of Highways may authorize the repair of any township bridge having a span of twenty feet or less in a township of the second class without the consent or permit of the Water and Power Resources Board. 1913, June 25, P. L. 555, §2; 1937, May 6, P. L. 559, §2; 1965, Sept. 24, P. L. 539, §1."

[2] 32 PS §685: "Powers respecting existing obstructions; legislative construction

"Upon complaint, or upon its own initiative, the Water and Power Resources Board shall have power to cause an investigation or examination to be made of any dam, or other water obstruction now existing or hereafter constructed. If the board shall determine

issue orders with respect to water obstructions which are found to be unsafe, in need of repair, or which are for any reason "derogatory to the regimen of the stream." That section also contains authority to make and enforce such rules and regulations as the department may deem necessary and proper for carrying out the purposes of the act. While this section appears to

that such dam or water obstruction is unsafe or needs repair, alteration or change in its structure or location, or should be removed as being unsafe and not susceptible of repair, or for any reason is derogatory to the regimen of the stream, the board shall, in writing, notify the owner or owners thereof to repair, alter, change its structure or location, or remove the same, as the exigencies of the case may require; such work to be commenced and proceeded with to completion within such reasonable time as may be prescribed in such notice by the board; and it shall thereupon be and become the duty of such owner or owners to comply with the provisions of such notice.

"If said owner or owners, notified as aforesaid, shall neglect or refuse to make such repairs, alterations, change or changes in structure or location or to cause such removal, or if said owner or owners cannot be found or determined, then the Board may make such repairs, alterations, change or changes in structure or location or cause such removal; and the board may thereafter recover, in the name of the Commonwealth, from the owner or owners, the said cost or expense, in the same manner as debts are now by law recoverable.

"It is the legislative intent that the provisions of this act shall extend to and include all types of water obstructions, regardless of the date when they were constructed, and whether or not the same were constructed by permission, express or implied, of the Commonwealth, or of any authorized agency thereof, and whether temporary or permanent, and to all changes in the course, current or cross section of any stream or body of water, whether such change be temporary or permanent. The Water and Power Resources Board is authorized and empowered to hold hearings, subpoena witnesses, perform any and all such acts, make and enforce such rules and regulations, and issue such orders, not inconsistent with this act, as it may deem necessary and proper for carrying out the purposes of this act. 1913, June 25, P. L. 555, §5; 1937, May 6, P. L. 559, §3."

apply to existing obstructions, the last paragraph indicates the legislative intent to apply a standard to obstruction and channel changes as prohibiting those "derogatory to the regimen of the stream." The Pennsylvania Supreme Court so construed the Act in Commonwealth of Pennsylvania, Water and Power Resources Board v. Green Spring Co., 394 Pa. 1, 145 A. 2d 178 (1958).

Neither the department nor its predecessor, the Water and Power Resources Board, has promulgated precise regulations establishing the criteria by which the act is to be administered. The board has issued a pamphlet, a copy of which appellant received, which tells an applicant what data are to be submitted in conjunction with an application to change the course of a stream. Nothing is said about how such applications will be judged or what the applicant can do to satisfy the requirements of the statute or the department's interpretation thereof. Appellant claims that due process requires the department to do so.

Appellants were told that Mr. Butler thought the proposed changes were unnecessary and that the Fish Commission opposed the applications. Appellant had no way of knowing what, if anything, it could do to make the changes acceptable. Until it received the letter denying the permit applications, appellant was not aware that any State agency other than the department was being asked to comment on the applications and had no information about the basis for responses from those agencies. The memoranda from the Fish Commission show that the opposition was stated without supporting data or reasons. Appellant claims that such consultation with the Fish Commission should be known and the commission should state its reasons for recommending disapproval.

Mr. Butler for the department and Mr. Miller for

the Fish Commission raised significant issues about the hydraulic and environmental effects of the proposed channel changes. Appellant's contention is that it was without notice that these factors were to be considered and of the specific way in which the issues were to be formulated and decided. Appellant learned of these matters for the first time in the hearing conducted as part of this appeal. Appellant did not ask for any continuance to permit it to present evidence to rebut the specific reasons for denial stated at the hearing and declined to offer further evidence when invited to do so by this board.

Appellant urges that the lack of rules and regulations, and hence the lack of notice to appellant of the criteria by which its applications would be judged, constitute a denial both of substantive and procedural due process. The due process requirements of the Fourteenth Amendment apply to administrative proceedings. See Morgan v. United States, 304 U.S. 1, 58 S. Ct. 773 (1938); Southern Railway Co. v. Virginia, 290 U.S. 190, 54 S. Ct. 148 (1933).

The department argues that Commonwealth of Pennsylvania, Water and Power Resources Board v. Green Spring Co. Inc., 394 Pa. 1, 145 A. 2d 178 (1958), establishes the validity of the act and of the department's action in this matter. In that case, the court held that the act was a proper delegation of legislative authority in that the act contains standards sufficient to guide the department in administering its provisions.

## II

An issue relating to the jurisdiction of this board arose in the course of the hearing and must be initially disposed of. Both the department and appellant assumed that the letter of February 2, 1972, written by Mr. Butler, was an order of the department denying

the applications. Both parties have submitted briefs supporting this position and urging that the board retain jurisdiction of the matter. Mr. Butler, in his testimony, claimed that he had not denied the permits, but had merely stated that he could not recommend them for approval. He testified that he did not have the authority to grant or deny permits, but merely made recommendations to a superior who had such authority through delegation by the Secretary of Environmental Resources. Mr. Butler said he had not forwarded the applications and that formal action on them had not been taken by the authorized designee of the secretary.

A close reading of the letter in light of Mr. Butler's testimony shows that technically it is capable of being read as he intended it. As a practical matter, however, no one reading the letter without a microscope would come to such a conclusion. Furthermore, Mr. Butler testified that in more than 1,800 cases in which he made recommendations to the Water and Power Resources Board, and in 300 or 400 cases in which he made recommendations to his superior in the department, a permit for stream relocation *never* has been issued in a case where he recommended against it. For all practical purposes, therefore, a negative recommendation by Mr. Butler is equivalent to a denial, and formal action by Mr. Butler's superior would be merely a ministerial act. To require appellant to resubmit the applications for formal action would be to require a vain act and would serve no useful purpose. Both appellant and the Commonwealth take the position that this board has jurisdiction. Accordingly, we hold that the letter of February 2, 1972, was a decision or order by the department from which an appeal to this board lies.

### III

Appellant's first contention is that it has been denied due process of law because there were no regulations concerning channel changes promulgated by the Department of Environmental Resources. The statute in question permits course changes which are not "derogatory to the regimen of the stream." We disagree with appellant's contention.

This and all statutes delegating authority on administrative bodies to administer general standards in the execution of the law have imported into them the requirement of "reasonableness": 1 Am. Jur. 2d, Administrative Law, §116. Accordingly, the standard appellant must meet is that the proposed action will not be "unreasonably derogatory to the regimen of the stream."

To claim lack of regulations defining the broad standard is a claim that the general broad delegation is so vague as to be a delegation of legislative authority and, accordingly, a power vested in the administrative agency to make the law or act arbitrarily. If the general broad delegation sets an intelligible criteria, the act has a sufficient standard to guide the department, there is notice to the public, and there are standards by which the courts may review administrative actions.

The statute does not have to spell out the specifics of what is meant by "derogatory to the regimen of a stream." Indeed, the reason why administrative agencies exist is because the Legislature is incapable of defining the multitudinous details of complex economic, social or scientific facts. In determining if there is an unconstitutional delegation of legislative powers, the area in which the powers are granted is one of the most important elements for consideration. Here, the

phrase "regimen of the stream" encompasses the entire field of limnology (the ecology of fresh water streams), one of the most complex of sciences. The formulation of specific quantitative criteria on aquatic life, velocity, flow, degree of erosion, public benefit, etc., is impossible. In such cases, the cases are clear and exact and precise criteria need not be set forth either in the statute or by regulation, but a standard of reasonableness must be applied.

The history of the growth of administrative agencies and the decisions of the courts on delegations of power to such agencies is one which indicates that delegations of the kind made here are to be upheld if it is possible to fairly do so: Loomis v. Philadelphia School District Board of Education, 376 Pa. 428, 103 A. 2d 769 (1954). Clearly, the legislature may not delegate to administrative agencies the determination of what the law shall be.

Broad and general standards such as the one set forth in the statute in question are not unconstitutional. The courts have upheld definitions broader than that in this case. Standards of administrative action based upon "necessity," "need," "necessary or expedient," "appropriate," "reasonableness," "just and reasonable," "fair and equitable," "sufficient," "excessive profits," "unduly complicated corporate structures and inequitable distributions of voting power," "unfit," "unsuitable," "competency, ability and integrity," "worthy cause," "decency and good order," "substantial," "undesirable business practices," "unprofessional conduct," "misconduct," "injurious substances," "danger to peace or safety." The following standards have been held adequate: "just and reasonable" (Tagg Bros. & Moorhead v. United States, 280 U.S. 420, 50 S. Ct. 220, 221, 74 L.Ed. 524); "public interest" (1930) (New York Central Securities Corp. v. U. S., 287 U. S. 12, 53

S. Ct. 45, 77 L.Ed. 138 (1932)); "public convenience," "interest" or "necessity" (Federal Radio Commission v. Nelson Bros. Bond & Mortgage Co., 289 U. S. 266, 53 S. Ct. 627, 77 L.Ed. 1166 (1933)). See also Breinig v. Allegheny County, 332 Pa. 474, 2 A. 2d 842 (1938); Annenberg v. Roberts, 333 Pa. 203, 2 A. 2d 612 (1938); Bell Telephone Co. of Pennsylvania v. Driscoll, 343 Pa. 109, 21 A. 2d 912 (1941); Marshall Impeachment Case, 363 Pa. 326, 69 A. 2d 619 (1949); Kellerman v. City of Philadelphia, 139 Pa. Superior Ct. 569, 13 A. 2d 84 (1940); Commonwealth v. Franklin, 172 Pa. Superior Ct. 152, 92 A. 2d 272 (1952).

The courts have said in many cases that standards of "in the public interest" or "public convenience and advantage" are sufficient where the context of statute deals with intelligible and not a limitless criteria.

We believe the question to be settled by Commonwealth of Pennsylvania Water and Power Resources Board v. Green Spring Co., supra. Regulations defining such general standards seldom exist and are usually impossible to formulate. The ecology of a fresh water stream is one of the most fragile and complex life systems in nature. Indeed, our research into laws and regulations of other States indicates that no State has been able to formulate definite criteria with respect to the degree of change in stream velocity, biological life, etc. The most definite criteria we have thus far seen are those of New York State, which list as factors to be considered:

1. Erosion of soil from banks or uplands.
2. Increased costs of water treatment.
3. Loss of crop land and forest by flooding.
4. Destruction and failure of natural propagation of fish and aquatic resources.
5. Loss of water for beneficial uses and purposes.
6. Pollution of affected waters.

7. Increases in turbidity.
8. Deposition of silt and debris.
9. Irregular variations in water velocity.
10. Irregular variations in temperature of waters.
11. Irregular variations in level of waters.

And these are restatements of common-law rights of riparian owners with respect to upstream channel changes. See generally 56 Am. Jur., Waters §15. Moreover, they do nothing more than state factors certainly obvious to any limnologist and, we think, to any layman confronted with the problem.

Appellant complains that the department did not spell out standards, which the legislature could not, and that it was misled by the application in that it did not know what precise objections the department had. The department cannot be expected to act as a consulting engineer for private parties and design projects to comply with the laws. It is required to tell applicants how their proposed change is inadequate. Appellant is charged with a knowledge of the law and that the law means that environmental factors are important, that the phrase "regimen of the stream" includes environmental factors, and that the rights of other riparian owners and the public must be taken into account.

The burden of proof was upon appellant here to prove that its action did not "unreasonably change the regimen of the stream." We are also cognizant of the fact that the purpose of this stream change was to provide additional usable land in connection with a recreation area for an apartment complex. It appears to be an irrefutable scientific fact that changing the channel of any stream means destruction of aquatic and fish life in that area except insofar as it may be supported by other areas of the same stream. The department argues that any channel change is "derog-

atory to the regimen" of a stream. However, this does not mean that all channel changes are forever prohibited. If the stream were long and hospitable to aquatic life and the channel change short and made for compelling social or economic reasons, we think that the department would be required to approve such a change because it would not be unreasonably derogatory to the total eco-system of the stream. In this case, we do not believe that the department acted arbitrarily or unreasonably in concluding that the net balance of the public interest would be served by denying the channel change. Appellant offered little or no proof that the channel change was of any more than marginal importance, if it was important at all, to improving the recreational potential of the area. Appellant offered no proof that a denial of this channel change would interfere with any reasonable use of this land, even for the recreational purposes for which it proposes to use it. In short, no good reason, much less a compelling reason, was offered to justify the unavoidable degradation of the affected streams. The plain fact is that all channel changes in streams containing fish and aquatic life are environmentally derogatory and while all factors must be considered, the ultimate question is: "Despite the environmentally derogatory nature of this change, is there a need to do so which, on balance, makes the change serve the public interest?" We think that a consideration of the public interest includes a reasonable and efficient use of land by private owners so that the necessity of the change for reasonable and efficient private land use must be considered.

We believe the statute adequate to give notice to the public of the applicable standard, but the department did, by C-1, require certain data, implying that conclusions from such data would determine its decision. In

fact, conclusions from other data and observations were used to deny the application. Perhaps the department's position would be better if it had no pamphlet and left it to the applicant or his engineers and limnologists to determine its position on how the change would not unduly harm the stream. (Assuming, of course, that very astute counsel would fathom the complexities of the basic statute and the cases construing it which set forth the standard to be applied.) Here, information was requested, and the decision made, on factors other than those on which information was requested. Furthermore, when a decision was made, appellant was left to wonder if the denial was authoritative and appealable. The department's position was first fully stated at the hearing before the board. However, appellant gave no indication of willingness to supply information on factors relating to the effect of the change on aquatic and fish life, channel stability, etc. It was offered the opportunity to do so and declined. Appellant is satisfied that it has made as good a record as it can. But, it does appear that appellant has been subjected to a Kafkaseque bureaucratic nightmare. Irrespective of the merits of a case, any citizen/applicant deserves better than that accorded appellant here.

## CONCLUSIONS OF LAW

1. The letter of February 2, 1972, from which this appeal has been taken, is a decision or order of the Department of Environmental Resources from which an appeal lies, and this board has jurisdiction of the matter.

2. The absence of regulations in this case do not constitute a violation of procedural and substantive due process inasmuch as the Water Obstructions Act contains standards by which the department's action may be reviewed to preclude arbitrary action by it.

3. The burden of proof is on appellant to establish that the channel change will not be "unreasonably derogatory to the regimen of the stream."

4. Appellant did not sustain its burden of proof by showing that its proposed channel change would not be "unreasonably derogatory to the regimen of the stream."

5. Appellant was not denied due process by the absence of regulations because the words "derogatory to the regimen of the stream" have a generally accepted meaning. We judicially note that changing the regimen would involve any of the following:

1. Erosion of soil from banks or uplands.

2. Increased costs of water treatment.

3. Loss of crop land and forest by flooding.

4. Destruction and failure of natural propagation of fish and aquatic resources.

5. Loss of water for beneficial uses and purposes.

6. Pollution of affected waters.

7. Increases in turbidity.

8. Deposition of silt and debris.

9. Irregular variations in water velocity.

10. Irregular variations in temperature of waters.

11. Irregular variations in level of waters.

6. Section 27 of Article I, of the Constitution requires the department to assess channel relocation applications in light of its mandate "As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people." These resources are defined as "the common property of all the people." The benefits to the public must substantially outweigh adverse environmental factors in order to qualify as being in the public interest. On the record, appellant has not established that the channel change has social, economic or recreational benefits to the public or even to appellant which benefits outweigh

the damage to aquatic life and the channel instability which the change would apparently cause. The final test to be applied in considering the factors set forth in 5 above is whether "the change is required for compelling social or economic reasons despite its adverse environmental impact."

7. Waters of the Commonwealth which may be affected by channel changes are not without the coverage of section 27 of Article I, because they flow over private land.

8. The department's action in requiring certain information on the stream change, but not requiring specific information on environmental factors, did not conform with the degree of notice and fairness required of administrative action. Such procedural failure was cured by this board giving the appellant the opportunity for further hearing on the hydraulic, environmental and public interest factors on which the department based its decision after those factors were enunciated at a public hearing.

## ORDER

The appeal of S & F Builders from the permit denials of February 2, 1972, is hereby dismissed.